# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

—————————

m 98-20546

—————————

HOUSTON INDEPENDENT SCHOOL DISTRICT,

> Plaintiff-Counter Defendant-
> Appellee,

VERSUS

BOBBY R.; JOYCE R.; and CAIUS R.,

> Defendants-Counter Claimants-
> Appellants.

—————————

Appeal from the United States District Court
for the Southern District of Texas

—————————

January 20, 2000

Before HIGGINBOTHAM and SMITH, Circuit Judges, and FALLON, District Judge.[*]

JERRY E. SMITH, Circuit Judge:

Caius R., a minor child, by and through his parents, Bobby R. and Joyce R., initiated this action against the Houston Independent School District ("HISD") in a claim before a Texas Education Agency ("TEA") hearing officer. The TEA determined that HISD had not provided Caius a "free appropriate public education" as required by the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* ("IDEA"), and the officer ordered HISD to make certain changes in Caius's education program. On appeal from the TEA's decision, the district court decided in favor of HISD. Concluding that the district provided a free appropriate public education in compliance with the IDEA, we affirm.

## I.

Caius attended school in HISD for approximately seven years before being removed to private school in 1997. Within HISD, he struggled from the beginning, in large part because of dyslexia. In kindergarten and first grade, he experienced difficulties in phonics. Although in 1992 HISD recommended that he repeat the first grade, preliminary evaluations of his need for special education indicated that he did not qualify for these special services.

—————————

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

During the summer preceding the 1992-93 school year, Caius's parents sought an independent evaluation of his learning abilities. After conducting a battery of tests, a University of Houston researcher found that Caius suffered from dyslexia and attention deficit disorder. Caius then enrolled in a private school for a substantial portion of the 1992-93 year. Although HISD had recommended repeating first grade, Caius was placed in a second grade class.

In March 1993, Caius returned to HISD at Mitchell Elementary and, in the fall of 1993, began third grade there. After experiencing more difficulties, he was referred in December 1993 for a special education evaluation, which revealed deficiencies in reading, oral language, and written language skills. Pursuant to the IDEA, the HISD convened an Admission, Review, and Dismissal ("ARD") Committee in January 1994 to determine the appropriate means of addressing Caius's learning disability. Having found that his was speech handicapped, the ARD Committee drafted an Individual Education Plan ("IEP") that called for ten hours of reading and language resource placement and one hour of speech therapy per week. Caius continued under the January 1994 IEP during the remainder of the 1993-94 school year.

At the beginning of the 1994-95 year, HISD placed Caius in the fourth grade. HISD experienced some difficulties during that year in implementing the speech therapy provision of the IEP, so from January 18, 1995, through May 17, 1995, a speech therapist was not on staff at Mitchell Elementary. To compensate Caius for the lost speech therapy, HISD authorized extended-year services for him. Consequently, during the summer following the 1994-95 school year, Caius received twenty-five hours in compensatory speech therapy.

In the meantime, however, Caius's parents voiced objections regarding the implementation of his IEP. In particular, they complained of HISD's failures to institute IEP modifications such as highlighted texts, modified tests, and taped lectures.

Before the 1995-96 year, HISD and Caius's parents engaged in extensive discussions regarding the school he would attend. Because it was determined that he learned more readily when information was presented in a multisensory fashion, his parents sought placement at an HISD school that could administer an Alphabetic Phonics ("AP") program. Although an alternative placement could not be established, HISD agreed to provide an itinerant teacher to instruct Caius at Mitchell Elementary until a permanent teacher skilled in AP could be found.

Caius began the AP program in the fall of 1995. Although his instructors changed, the AP program was provided throughout the 1995-96 school year. Nonetheless, his parents continued to criticize HISD's implementation of several modifications to the IEP.

During the spring and fall of 1996, the ARD Committee convened to develop an IEP for Caius's sixth grade year. Under the IEP, he was placed at Codwell Elementary. The plan included seven modifications to his educational program: modified tests, taped texts, highlighted texts, extended time for assignments, shortened assignments, calculator use, and taped assignments. Furthermore, because no teacher at Codwell was trained in AP techniques, HISD began a search for another AP instructor for Caius.

Despite its efforts, for two months Caius did not receive AP training. During that time, his parents refused to accept the compensatory AP services offered by HISD. Through their complaints to HISD, they also questioned the amount of progress Caius was making under the IEP and the extent to which his teachers were implementing the modifications to the August 1996 IEP.

In October 1996, Caius's parents sought administrative review of the IEP. Following two days of hearings in February 1997, the TEA hearing officer filed written findings of fact and conclusions of law, deciding that the reading and language goals set forth in Caius's IEP's were "reasonable and calculated to provide . . . an educational benefit." But she also found that HISD had failed to implement, "consistently or appropriately," an AP program, IEP modifications, or speech therapy. The hearing officer thus concluded that HISD's failures in these areas had deprived Caius of a "free appropriate public education" under the IDEA.

Following entry of the hearing officer's decision, the parties failed to negotiate a new IEP for Caius for the 1997-98 school year. In response, his parents sought private compensatory services during the summer of 1997, and, before the start of the 1997-98 year, his parents withdrew him from HISD and placed him at a private school at their expense and without HISD's approval.

HISD appealed the TEA hearing officer's decision to the district court, which, on cross motions for summary judgment, held that the TEA had erred in its analysis of whether Caius had indeed received a "free appropriate public education" as required by the IDEA. The court reasoned that he had shown improvement in most areas of study and therefore had received an educational benefit in accordance with the goals of the IDEA. The court then granted HISD's motion for summary judgment and denied Caius's cross motion for summary judgment. The court also dismissed Caius's counterclaim for reimbursement for the costs of the private compensatory services.

## II.

Caius challenges the determination that HISD provided him with a "free appropriate public education" in accordance with the IDEA, 20 U.S.C. § 1400, *et seq.* Specifically, he points to HISD's failure to provide a speech therapist for a substantial portion of the 1994-95 term, its failure to provide an AP program for approximately two months during the beginning of the 1996-1997 year, and its general failures consistently to provide highlighted and taped texts in accordance with the IEP.

HISD responds first by acknowledging the failures summarized by Caius and by noting that, as a result, there are no genuine issues of material fact that would preclude summary judgment. HISD disagrees, however, with the legal conclusions to be drawn from those failures. It argues that, rather than holding that *any* failure to implement an element of an IEP amounts to denial of a free appropriate public education under the IDEA, we should look to the overall educational benefit received by the child and to whether the IEP was substantially or materially implemented.

## A.

The IDEA is designed to encourage state and local education agencies to extend services to children that are deemed learning disabled. Under the statute, to receive federal funding, a state must establish special education and related services that "are provided in conformity with the *individualized education*

*program* required under section 1414(a)(5) of this title." 20 U.S.C. § 1401(17)(D) (emphasis added). The term "individualized education program" is defined as

a written statement for each child with a disability developed in any meeting by a representative of the local educational agency . . . which statement shall includeSS

(A) a statement of the present levels of educational performance of such child,

(B) a statement of annual goals, including short-term instructional objectives,

(C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, . . .

(E) the projected date for initiation and anticipated duration of such services, and

(F) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

20 U.S.C. § 1401(20).

The crafting of an IEP is subject to extensive procedural and substantive requirements. For instance, the IDEA provides procedural safeguards that allow the parents an opportunity to challenge the establishment or implementation of the IEP in an "impartial due process hearing which shall be conducted by the State educational agency . . . as determined by State law." 20 U.S.C. § 1415(b)(2). In Texas, the hearing is conducted before the TEA.

The IDEA also provides for civil actions and jurisdiction in federal district court "without regard to the amount in controversy. In any action brought under this paragraph the

court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). As additional protection for the parents and the disabled child, "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child." 20 U.S.C. § 1415(e)(3)(A).

The Department of Education has interpreted the IDEA to require each public agency to "(1) Provide special education and related services to a child with a disability in accordance with the child's IEP; and (2) Make a *good faith effort* to assist the child to achieve the goals and objectives or benchmarks listed in the IEP." 34 C.F.R. § 300.350(a) (emphasis added). That interpretation provides, however, that the IDEA "does not require any agency, teacher, or other person be held accountable if a child does not achieve the growth projected in the annual goals and benchmarks or objectives." *Id.* § 300.350(b).

B.

The "free appropriate public education" requirement of the IDEA requires tailoring to the unique needs of the handicapped child by means of an IEP. *See Board of Educ. v. Rowley*, 458 U.S. 176, 181 (1992). "Noticeably absent from the language of the statute is any substantive standard prescribing the level of education to be accorded handicapped children." *Id.* at 189. After a lengthy analysis of the statute, its purposes, and of the legislative intent with respect to the provision of educational services to disabled children, the *Rowley* Court held that an "'appropriate education' is provided when personalized educational services are provided." *Id.* at 197.

Accordingly, the IDEA "generates no additional requirement that the services so

provided be sufficient to maximize each child's potential." *Id.* at 198. This, the Court opined, would be "further than Congress intended to go." *Id.* at 199. Instead, the IDEA is aimed at providing disabled children "access" to a public education, though that access must still "be sufficient to confer *some* educational benefit upon the handicapped child." *Id.* at 200 (emphasis added). In the end, then, "the 'basic floor of opportunity' provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201.

Next, the Court noted that while the determination whether children are receiving sufficient educational benefits to satisfy the requirements of the IDEA "presents a more difficult problem," a court's inquiry in suits brought under § 1415(e)(2) (as here) should be analyzed under a two-pronged framework. "First, has the State complied with procedures set forth in the Act? And second, is the [IEP] developed through the Act's procedures *reasonably calculated to enable the child to receive educational benefits*?" *Id.* at 206-07 (emphasis added). The Court noted that under the second prong, "the achievement of passing marks and advancement from grade to grade will be one important factor in determining educational benefit." *Id.* at 207 n.28.

Caius does not challenge the IEP or any other HISD actions on the basis of the first prong of the *Rowley* inquirySSthat is, he does not assert that HISD did not comply with the lengthy procedures prescribed by the IDEA. And it is doubtful that such a challenge would have any merit.[1] Therefore, the issue is whether the IEP was "reasonably calculated to enable [Caius] to receive an educational benefit."

---

[1] *See Decision of the Hearing Officer*, Docket No. 089-SE-1096, noting:

In this case, issues related to any procedural complaints were withdrawn prior to the beginning of the hearing. Indeed, the evidence showed that Caius' parents were active participants in each and every ARD meeting and that their recommendations and
(continued...)

(...continued)
requests in both programming and placement decisions were often accepted by the ARD Committee. The IEP's at issue were the result of collaborative efforts between parents and school, and I find, therefore, that the district did comply with the procedural requirements of the IDEA.

III.

In *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 247-48 (5th Cir. 1997), we summarized the standard under *Rowley*. An IEP

> need not be the best possible one, nor one that will maximize the child's educational potential; rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him "to benefit" from the instruction. In other words, the IDEA guarantees only a "basic floor of opportunity" for every disabled child, consisting of "specialized instruction and related services which are individually designed to provide educational benefit." Nevertheless, the educational benefit to which the Act refers and to which an IEP must be geared cannot be a mere modicum or de minimis; rather, an IEP must be "likely to produce progress, not regression or trivial educational advancement." In short, the educational benefit that an IEP is designed to achieve must be "meaningful."

(Internal citations omitted.)

When a district court reviews a state hearing officer's decision in an impartial due process hearing under the IDEA, it must receive the record of the administrative proceedings and is then required to take additional evidence at the request of any party. 20 U.S.C. § 1415(e)(2). It must accord "due weight" to the hearing officer's findings, *see Rowley*, 458 U.S. at 206, but must ultimately reach an independent decision based on a preponderance of the evidence." *Cypress-Fairbanks*, 118 F.3d at 252. Thus, the district court's review is "virtually de novo." *Id.*

Our review of the district court is a mixed question of fact and law that is reviewed *de novo*, but the underlying fact-findings, "such as findings that a disabled student obtained educational benefits under an IEP, are reviewed for clear error." *Id.* A party attacking the appropriateness of an IEP established by a local educational agency bears the burden of showing why the IEP and resulting placements were inappropriate under the IDEA. *Id.*

A.

In *Cypress-Fairbanks*, we set forth four factors that serve as an indication of whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA. These factors are whether

> (1) the program is individualized on the basis of the student's assessment and performance;
>
> (2) the program is administered in the least restrictive environment;
>
> (3) the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and
>
> (4) positive academic and non-academic benefits are demonstrated.

118 F.3d at 253.

Correctly, HISD argues in its brief, and the district court noted, that only the last two of these factors are seriously in question. First, Caius does not argue that the IEP was not individualized in accordance with the first factor; indeed, such an argument would seem unavailing where the TEA hearing officer had already concluded that the IEP was "reasonably calculated to provide Caius with a meaningful educational benefit." Second, the "least-restrictive-environment" factor should be viewed in light of the IDEA's "preference for 'mainstreaming' handicapped childrenSSeducating them with nonhandicapped children." *Rowley*, 458 U.S. at 181 n.4. Because Caius was "mainstreamed" and does not now challenge the IEP on the ground that it was not implemented in the least restrictive means, this second factor is likewise not at issue.

**6**

The third and fourth factors, however, call for a more thorough analysis. The requirement that the educational services be provided in a "coordinated and collaborative manner by the key stakeholders" presents a more difficult issue. On the one hand, the district court concluded that HISD met this requirement because "HISD provided the modifications and services outlined in Caius' IEP, allowed Caius' parents to air grievances, and regularly conducted ARD Committee meetings to evaluate Caius' progress under the IEP." While the court opined that the "most significant failing" in this area involved the fact that for substantial portions of the 1994-95 academic year a speech therapist was not available at Mitchell Elementary, the court nonetheless felt that the compensatory services offered the following summer were sufficient to remedy any shortcoming. And with respect to HISD's inability to provide an AP program for two months during the beginning of the 1996-97 year, HISD argues that the school offered compensatory AP services (which Caius's parents refused) until the school could hire an AP teacher. The court agreed with HISD with respect to the AP services, though it did not carefully analyze the issue.

On the other hand, the hearing officer concluded that HISD had failed on both accounts. That is, she concluded that the compensatory speech therapy services provided by HISD did not cure its earlier failure to implement that portion of the IEP and that the HISD had agreed to provide AP services and had failed to do so in a consistent and proper manner. These conclusions would support Caius's argument that HISD failed to provide the services in a "coordinated" manner, as would his assertion that HISD did not provide highlighted or taped texts in a consistent manner.

The district court's primary reason for overturning the hearing officer's conclusions seems to be its belief that local school agencies should retain some flexibility in scheduling services and, when necessary, providing compensatory services. The court pointed to a Department of Education interpretive response in noting that, "as long as there is no change in the overall amount, some adjustments in scheduling [IEP] services should be possible (based on the professional judgment of the service provider) without holding another IEP meeting." 34 C.F.R. part 300, app. C, question 51 (1997). Accordingly, the court disagreed with the TEA hearing officer and concluded that the compensatory speech therapy services were sufficient.

This conclusion is correct, particularly in light of the Department of Education's interpretive response. Moreover, with respect to the speech therapy and AP services, the district court invited us to consider *Gillette v. Fairland Bd. of Educ.*, 725 F. Supp. 343 (S.D. Ohio 1989), *rev'd on other grounds*, 932 F.2d 551 (6th Cir. 1991), in which the court held that a local education agency's failure to provide all the services and modifications outlined in an IEP does not constitute a *per se* violation of the IDEA. In *Gillette*, the court found that the local agency had provided a free appropriate education when "*significant provisions* of the IEP were followed," even though the petitioner had clearly demonstrated that portions of the IEP were not implemented at all. *See id.* at 347-48 (emphasis added). The same can be said hereSSi.e., the significant provisions of Caius's IEP were followed, and, as a result, he received an educational benefit.[2]

The approach taken in *Gillette* seems reasonable, particularly in light of *Rowley*'s flexible approach. Therefore, we conclude that to prevail on a claim under the IDEA, a party challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and,

---

[2] While consideration of any educational benefit received might arguably seem to conflate the third and fourth prongs of the *Cypress-Fairbanks* inquiry, determination of what are "significant" provisions of an IEP cannot be made from an exclusively *ex ante* perspective. Thus, one factor to consider under an *ex post* analysis would be whether the IEP services that were provided actually conferred an educational benefit.

instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP. This approach affords local agencies some flexibility in implementing IEP's, but it still holds those agencies accountable for material failures and for providing the disabled child a meaningful educational benefit.

The fourth and final factor under *Cypress-Fairbanks* is whether there have been demonstrable academic and non-academic benefits from the IEP. The district court framed the issue under this inquiry as what should be the appropriate manner for measuring academic advancement under the IDEA. Caius claimed that a child's percentile scores were the best measure of academic performance, while HISD argued that passing marks and advancement from grade to grade were sufficient indicia to satisfy the IDEA. And on this dispute the district court is correct that a disabled child's development should be measured not by his relation to the rest of the class, but rather with respect to the individual student, as declining percentile scores do not necessarily represent a lack of educational benefit, but only a child's inability to maintain the same level of academic progress achieved by his non-disabled peers. As with the argument in *Rowley* that an IEP must maximize a child's potential, the argument that Caius should not experience declining percentile scores may be an unrealistic goal, and it is a goal not mandated by the IDEA.

Instead, the district court was correct to focus on the fact that Caius's test scores and grade levels in math, written language, passage comprehension, calculation, applied problems, dictation, writing, word identification, broad reading, basis reading cluster and proofing improved during his years in HISD.[3] These

improvements are not trivial, and we cannot say that the district court committed "clear error" in its factual determination that Caius received an educational benefit from his IEP. *See Cypress-Fairbanks,* 118 F.3d at 252.

The affidavits submitted by Caius do not change our conclusion. First, Nancy LaFevers, a licensed language pathologist who examined Caius on two occasions, opined that his progress was slower than what she would have expected under "appropriately implemented [AP] training" and that his progress in word attack skills was *de minimis*. Even accepting that characterization of his improvement in word attack, it is not necessary for Caius to improve in *every* area to obtain an educational benefit from his IEP.

Second, Caius submitted an affidavit from Donna Weinberg, the owner and director of the privately-run Cliffwood School where he began attending in 1997. She noted only that Caius has progressed "nicely" since his arrival at Cliffwood School and that he was adjusting to another way of approaching his studies. These statements say nothing about his development or lack thereof, during his years

---

[3] HISD employed the widely utilized and accepted Woodcock Johnson intelligence and achievement test to indicate Caius's academic progress. Caius's test scores showed the following changes from 1993 to 1995: (1) Math scores improved from the 1.7 grade level to 3.1; (2) (continued...)

(...continued)
written language improved from the 1.5 grade level to 1.9; (3) passage comprehension went from 1.7 to 2.2; (4) calculation rose from 1.4 to 3.3; (5) applied problems improved from 2.0 to 3.0; (6) dictation went from 1.6 to 1.8; (7) writing improved from 1.4 to 2.6; (8) word identification, basic reading skills, and letter identification rose from 1.8 to 2.1; and (9) word attack rose from the level of a seven-month kindergarten student to grade level 1.8.

From 1995 to 1996, Caius showed the following improvements: (1) Broad reading increased from 2.1 to 3.3; (2) word identification from 2.1 to 2.8; (3) passage comprehension from 2.2 to 3.9; (4) math from 3.1 to 4.4; (5) calculation from 3.3 to 5.0; (6) applied problems from 3.0 to 3.6; (7) written language from 1.9 to 2.9; (8) dictation from 1.8 to 2.8; (9) writing samples from 2.6 to 3.3; (10) basic reading cluster from 2.1 to 2.8; and (11) proofing from 2.3 to 2.6. Only word attack remained the same, at the 1.8 grade level.

in HISD, and, as a result, they do nothing to establish that he did not receive an educational benefit from the IEP.

Finally, Caius offered the affidavit of Jean White, the owner and operator of Educere, where Caius received private tutoring from White in 1997. Again, like Weinberg's statements, White's affidavit does not establish that Caius received no educational benefit from HISD. Instead, her affidavit would, at best, support an argument that the IEP developed for Caius did not maximize his educational potential. But as *Rowley* held, the IDEA does not require maximization of a disabled student's educational potential.

There is no genuine issue of material fact about whether Caius received an educational benefit from the IEP, as demonstrated by the objective evidence of increased scores and grade levels. And because there were no material issues of fact presented under the other three *Cypress-Fairbanks* criteria, the district court was correct in finding that Caius received a free appropriate public education in accordance with the IDEA.

### B.

Likewise, the court was correct to reject Caius's claims for reimbursement. Although 20 U.S.C. § 1415(e)(3)(A) provides that "during the pendency of any proceedings conducted pursuant to this section, . . . the child shall remain in the then current educational placement of such child," "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk. If the courts ultimately determine that the IEP proposed by the school officials was appropriate, the parents would be barred from obtaining reimbursement for any interim period in which their child's placement violated § 1415(e)(3)." *School Committee v. Department of Educ.*, 471 U.S. 359, 373-74 (1985). Because HISD did not consent to Caius's transfer to private school, the district court's dismissal was appropriate.

### IV.

In sum, we find that the IEP was reasonably calculated to provide Caius a meaningful educational benefit, in accordance with the IDEA. Moreover, he received that benefit, as demonstrated by his increased test scores in a variety of areas. There is also no evidence that HISD consented to his transfer to private school during the pendency of this appeal. Therefore, the district court was correct in reversing the decision of the hearing officer, in holding that Caius was not denied a "free appropriate public education," and in denying Caius's claims for reimbursement.

AFFIRMED.

**9**