**SOCORRO INDEPENDENT SCHOOL DISTRICT, Plaintiff,**

v.

**ANGELIC Y., b/n/f ANGELA T., Defendant.**

**No.  EP–00–CA–44–H.**

United States District Court, W.D. Texas, El Paso Division.

May 23, 2000.

---

Henry C. Hosford, Baskind, Samaniego
& Hosford, El Paso, TX, Denise H.
Anderson, Walsh, Anderson, Brown, Schul-

ze, and Aldridge, P.C., Austin, TX, for plaintiff.

James Kirby Read, Jr., El Paso, TX, Antonio Cortez, El Paso, TX, for defendant.

## MEMORANDUM OPINION AND ORDER

HUDSPETH, District Judge.

This action is in the nature of an appeal from the decision of a Texas Education Agency ("TEA") Special Hearing Officer ("Officer"), brought pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. Plaintiff Socorro Independent School District ("SISD") seeks to overturn a decision ordering it to reimburse next friend Angela T. for the private schooling costs she incurred after unilaterally withdrawing her daughter, Defendant Angelic Y. ("Angelic"), from O'Shea–Keleher Elementary School ("O'Shea"). Angela T.'s withdrawal decision followed a meeting with SISD officials in April 1997 regarding her daughter's academic progress. The SISD had planned to allow Angelic to advance from O'Shea to William D. Slider Middle School ("Slider"), but Angela T. felt Angelic was not ready. After the principals of two parochial schools determined they could not treat Angelic for her learning disability, Angelic's mother enrolled her daughter at The Bridges School ("Bridges"), a private school for the learning disabled. On August 12, 1998, Defendant filed a petition for due process with the TEA Officer. A two-day administrative hearing was held on November 9 and 10, 1998. On August 5, 1999, the Officer issued a decision in which she impliedly found that the educational benefits provided to Angelic by the SISD were *de minimis*, and that Angelic's placement at Bridges was proper. On February 22, 2000, the SISD timely filed the present complaint.[1] On May 3,

2000, the parties filed cross motions for summary judgment; subsequently, the SISD filed a response. This case is now ripe for decision.

■ A district court has jurisdiction to review an appeal of a state administrative hearing concerning a claim under the IDEA without regard to amount in controversy. See 20 U.S.C. § 1415(I)(2)(A). Although it should assign "due weight" to a hearing officer's findings, a court reviewing an IDEA case must ultimately reach an independent decision based on a preponderance of the evidence; moreover, its review is virtually *de novo*. See *Houston I.S.D. v. Bobby R.*, 200 F.3d 341, 347 (5th Cir.2000).

■ Under IDEA, public school districts in states receiving certain federal funds must provide each child with a "free and appropriate public education" ("FAPE"). See 20 U.S.C. § 1401(8). To determine whether a school district has provided a FAPE, a district court must make the following inquiries: "First, has the State complied with the procedures set forth in [IDEA, a]nd second, is the individualized educational program ['IEP'] developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Board of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 207–08, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). The IEP consists of requirements and procedures which are set forth in 20 U.S.C. § 1414(d). The IEP plays a critical role in the overall FAPE inquiry. See *Rowley*, 458 U.S. at 203–04, 102 S.Ct. at 3049. In assessing an IEP, the Court of Appeals for the Fifth Circuit requires courts to ask whether:

(1) the program is individualized on the basis of the student's assessment and performance;

*State of Texas*, 723 F.2d 432, 436–38 (5th Cir.1984).

---

1. In the Fifth Circuit, the limitations period for an IDEA appeal runs for two years from the date of the TEA decision. See *Scokin v.*

(2) the program is administered in the least restrictive environment;

(3) the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and

(4) positive academic and non-academic benefits are demonstrated.

*Bobby R.*, 200 F.3d at 347–48 (5th Cir. 2000) (citing *Cypress–Fairbanks I.S.D. v. Michael F.*, 118 F.3d 245, 253 (5th Cir. 1997)). An IEP need not be the best possible one, nor one that will maximize the child's educational potential; it must only provide the child a basic floor of opportunity. See *Cypress–Fairbanks*, 118 F.3d at 247–48. The educational benefits cannot be *de minimis*; rather, they must represent "meaningful progress" for the child's education. See *id.* Parents who remove their child from a public school without the school district's consent do so at their own financial risk; "*only* if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act" will the parents be entitled to reimbursement. *Florence County S.D. Four v. Carter*, 510 U.S. 7, 15, 114 S.Ct. 361, 366, 126 L.Ed.2d 284 (1993). The burden of proof rests with the parent to show that the IEP is flawed. See *Alamo Heights I.S.D. v. State Bd. of Educ.*, 790 F.2d 1153, 1158 (5th Cir.1986).

The first *Cypress–Fairbanks* factor to address is whether, based on the SISD's assessment of her disability, Angelic's IEP was sufficiently individualized. There is no doubt that SISD recognized that Angelic suffers from a learning disability; the only question concerns the precise label to affix to her condition. Dr. Robert Woody described Angelic as having "static encephalopathy," a term broadly connoting brain disfunction of unknown origin. (Woody II:175–93.[2]) The disease prevents a child's brain from functioning normally

within approximately two standard deviations of the child's age. It manifests itself particularly in slow auditory and visual processing. The slow development in turn leads to behavioral problems, and can affect cognitive attention span. The disease will not progress; instead, academic progress can be achieved by continuing to develop learning skills at an individualized pace.[3] Dr. Woody's diagnosis corresponds very closely to Angelic's symptoms, as evinced by the first-hand observations of teachers and diagnosticians at O'Shea and Bridges. Her teachers described her as having a very mild dyslexia, difficulty processing sounds and words, and trouble with reproducing pictures and symbols. (Hendricks I:228–30; Teegarden II:25–29.) Both the testimony and Angelic's results on various tests indicate that the child's progress in different academic areas is uneven, reflecting in large part a need to proceed at a slower pace. (Collins II:108–30; Hendricks I:239–41; Appendix, *infra*, at 13.) The tests also indicate, first, that her development is within approximately two standard deviations of her age, as Dr. Woody suggested; and second, that SISD personnel were aware of this disability and its manifestations, even though they did not have a precise name for it. (Keys I:212–15; Teegarden, II:25–33; Collins II:259–60.)

The parties hotly dispute whether Angelic suffered from "attention deficit disorder" ("ADD"). Under Defendant's theory, the SISD's failure to formally diagnose Angelic as having ADD meant that the IEP was ineffectual per se, since proper diagnosis would have led to greater accommodation in her special and regular education classes, as well as medication. The weight of the evidence suggests that the child did not have ADD. Witnesses who evidently had significant experience with ADD children opined that Angelic did

---

**2.** The Court will cite to the transcripts found in volume two of the administrative record by using the witness's name, followed by the transcript volume and page number.

**3.** As Dr. Woody explained, "If [a brain disease] is static, it's better to get on with other things and not keep ruminating about why, why, why." (Woody II:193.)

not have the disease. (Teegarden II:35–36; Smith II:197–207.) Rather, her short attention span was a product of her being unable to process information. (Teegarden II:35–36; Smith II:200–02; Moltane I:68.) The only witness who concluded that Angelic had ADD was Dr. Rodolfo Fierro Stevens, the child's pediatric neurologist; however, he seemed less than convinced, noting that Angelic had only "mild," "potential" or "probable" ADD. (Fierro I:105–14.) The Court is persuaded that Angelic's attention span was the result of "clicking off" whenever she was overloaded with information in the classroom. (Accord Moltane I:68.)

Even disregarding this conclusion, the record clearly shows that SISD's failure to diagnose Angelic for ADD would not have affected the IEPs because the remedies for significant inattention was the same whether a child had ADD or a "regular" learning disability. (Fierro I:115; Teegarden II:37–41.) These measures include shortened assignments, extra time for completion, substituting lectures for a multi-sensory "hands-on" approach, inserting more concrete examples into the instruction, breaking down assignments into smaller parts, sitting closer to the teacher, and use of textual markers to stay focused. (Teegarden II:40; IEP 3/8/95 at 5; IEP 4/1/97 at 15–16.) Second, the Court finds that treating Angelic's ADD through medication would have made no discernible difference in remedying her disability. The evidence indicates that the drugs normally used to treat ADD (e.g. Ritalin and Adderall) negatively impacted Angelic when she was medicated at Bridges. (Fierro I:108–09; Hendricks I:233–34.) She subsequently withdrew from medication due to the side effects. Thus regardless of whether "ADD" or "static encephalopathy" serves as the point of departure, the equifinality

of the conclusion is inescapable: the SISD successfully determined that Angelic suffered from a generic learning disability affecting her development and behavior.

The *Cypress–Fairbanks* test also asks whether the IEP was individually designed to address the child's learning disability, and whether the key stakeholders collaborated in designing the IEP to give the child an education in the least restrictive environment. The testimony establishes that in 1993, the SISD conducted a comprehensive initial assessment ("CIA") of Angelic's disability. (Teegarden II:9–32.) The CIA was based on observations of the child made by a diagnostician over several hours of testing. (Id.II:69.) A CIA reassessment was done in 1996 to update the earlier report. (Id.) Each year from 1993 to 1997, the SISD convened an Admissions, Review and Dismissal Committee ("ARD"), as required by 20 U.S.C. § 1401(20), to set forth an IEP. In addition to regular teachers, special education teachers, diagnosticians, and administrators, Angelic's mother attended these meetings. (Angela T. I:127–37; Collins II:120–22.) Each meeting would last from forty-five minutes to one hour. (Collins II:160–61; Teegarden II:10–11.) The ARD solicited and received suggestions from Angelic's mother which ranged from concerns about her attention span and progress, to requests for tutoring. (Collins II:127–29.)

Using observations raised at these meetings by all attendees, as well as the CIA and comparisons of various test results, the ARD produced IEP summary reports containing a variety of instructions and objectives for Angelic. The ARD would then discuss the goals of the program and future modifications with Angelic's mother. (Teegarden II:162–63.[4]) In years where Angelic's progress was mediocre, such as

---

4. The evidence suggests that Angelic's mother regularly received the IEPs and a booklet describing ARD procedure and the rights of the parent with regard to SISD's special education program. (Angela T. I:168–70; IEP Summary Reports 1993–97) Although she received them, it does not appear that she necessarily read or understood them prior to 1996–97; however, in that year, she evidently began taking a more active interest in Angelic's progress. (Angela T. I:128–31; Collins II:127–28.)

in the 1995–96 school year, the ARD would reduce the number of objectives in the belief that her teachers should focus on the goals that Angelic could reasonably master, rather than making piecemeal progress in too many areas. (Collins II:146–51.) In 1996, when Angelic became depressed, the ARD held a special meeting to recommend counseling and treatment. (Teegarden II:44.[5]) The IEP reports themselves, as well as the testimony, provide sufficient evidence to show that the ARD complied with the IDEA in fashioning academic and non-academic goals for Angelic. (IEP Summary Reports 1993–97.)

The evidence also indicates that Angelic's IEPs were effectively implemented. Of particular importance were the variety of measures employed by Vickie Collins, Angelic's special education teacher, in Angelic's daily three-hour special education class. The classes took place in a special room and consisted of between four and twelve students. (Collins II:138–40.) During class, the students would often be divided into smaller groups or taught one-on-one. (Id.) The measures Collins used included: content mastery services to pursue social and physical sciences at a slower pace; special instruction in reading, language arts and math; a phonetics program focusing on oral and written comprehension, as well as spelling; and an accelerated computerized reading program. (Id. II:110–13, 120.) To evaluate Angelic's performance, Ms. Collins annually employed an elaborate method called Brigance testing to determine Angelic's equivalent learning skills as compared with students in regular education, based on indicators such as word recognition and math operations. (Collins II:115–20.) The Brigance test results were then used to establish Angelic's approximate grade level equiva-

lency, and to determine goals for the following academic year. (Id.II:121.[6]) In addition to special education, the SISD attempted to treat her for depression in 1996–97. (Teegarden II:197–98.) Angelic received counseling for approximately one hour a week; she was taken out of counseling in April 1997.

While the special education and counseling efforts were fairly extensive, the evidence also shows that SISD attempted to educate Angelic in the least restrictive environment. This philosophy, known as "mainstreaming," is explicitly stated as a key goal of IDEA, and was recognized by the Supreme Court as one of the Act's central tenets. See 20 U.S.C. § 1400(c); Rowley, 458 U.S. at 181–82, 102 S.Ct. at 3038. Angelic's special education classes were meant only to supplement the regular education classes she attended for most of the day. (Collins II:108–10, 132.) Angelic's special education teacher met with her regular education teacher to discuss Angelic's progress approximately once a week. (Id.II:163–64.) The modifications used for ADD children were made in the regular classroom to attempt to compensate for Angelic's short attention span. (Teegarden II:40–42; IEP 3/8/95 at 5.) The accelerated reading program contributed to Angelic's incorporation into the mainstream, insofar as both regular and special education students were rewarded for reading as many electronic books as they could at their own pace. (Collins II:125–27.) The rewards consisted of credits which allowed each student to "purchase" pencils, stickers, and other items. Thus, by rewarding each student for the number of books independently read, regardless of how much time it took them, the program enabled the learning disabled to compete with other students

---

5. The cause of Angelic's depression is unclear; it seems to have been a combination of frustration caused by her learning disability, anxiety created by having live-in relatives for several months, and difficulties interacting with other students. (Angela T. I:137–39, 169–76; Collins II:124–25.)

6. Brigance tests are recognized nationally and in Texas as a valid means of testing grade equivalents. (Lloyd II:219–20.)

and share the benefits of a general learning program.

■ The record shows by a preponderance of the evidence that SISD fulfilled its responsibility to provide Angelic with a FAPE by designing proper and realistic IEPs, implementing the ARD's recommendations and modifications in the classroom, including Angelic's mother and teachers in the ARD process, and attempting to provide, to the extent possible, educational benefits in regular and special instruction. The only remaining question under *Cypress–Fairbanks* is whether these measures benefitted Angelic.

■ The Officer in this case impliedly found that the benefits from the SISD's plans were *de minimis*. This Court cannot agree. First, the Brigance tests illustrate that for a child whose brain was developing within two standard deviations of her age, Angelic was essentially staying within two grade levels of her actual grade for each learning skill. (Appendix, *infra*; see also Woody II:179–80 (noting that it was unlikely that Angelic will ever fully "catch up").) Although some years she made less progress, it appears that she made much better progress in the year in which Ms. Collins modified the IEP objectives. The Court also affords some weight to Collins's assertion that the tests belie Angelic's true progress in regular and special education, given that it was Collins who administered the tests and spent the most time with Angelic.[7] It is also worth noting that Angelic's Brigance scores did not significantly improve during her first year at Bridges; in fact, her development

mirrored the previous rate of progress. (Thurman II:258–68; Appendix, *infra.*) The use of the accelerated reading program resulted in her taking out library books and reading them on her own, whereas before 1996 she had remained frustrated and unwilling to read. (Collins II:125–27.) Finally, the counseling and individualized instruction she gained in the 1996–97 year yielded meaningful non-academic benefits: her demeanor and self-confidence improved, and she began to interact positively with her peers. (Id. II:124–31.[8]) The Court finds that these academic and non-academic benefits represent meaningful progress under IDEA.

Given that "a disabled child's development should be measured not by [her] relation to the rest of the class, but rather with respect to the individual student," the Court cannot find that the SISD's IEPs for Angelic were flawed. See *Bobby R.*, 200 F.3d at 349. Rather, the evidence shows that Angelic made meaningful progress while at O'Shea. Further, the evidence suggests that the same types of measures that worked at O'Shea (e.g. the accelerated reading program) would have been available at Slider Middle School. (Collins II:252; Kelch II:273–79.) The Court emphasizes that it is not second-guessing the decision of Angelic's mother to place the child in a private school: it was her prerogative to decide that Angelic needed more than what was being provided by the SISD. Its only obligation is to determine whether the SISD's measures were so woefully inadequate that reimbursement is mandated. The evidence supports the opposite conclusion.

---

7. (Collins II:131 (academic and emotional transformation in 1996–97), 163–64 (progress in regular education), 231–37 (explaining non-Brigance test results suggesting regression), 249–51 (noting that certain indicators are not included on Brigance summaries); Lloyd II:221–27 (subjectivity of tests).)

8. Angelic's emotional problems appear to have prompted her withdrawal from O'Shea. Angela T. claimed that Collins had told her to enroll Angelic in a private school because of the SISD's inability to address her learning

disability; yet Collins testified that she had only suggested a private school because of Angela T.'s concerns about Angelic's relationship with a boy. (Compare Angela T. I:143 with Collins II:132–33, 237–40.) The maturing process is not a phenomenon exclusive to the learning disabled; furthermore, it appears as though Angelic's "problem" persisted at Bridges. (Smith II:206.) Thus, it cannot be said that the SISD violated IDEA by not remedying "adolescence."

It is therefore ORDERED that judgment be, and it is hereby, entered in favor of Plaintiff Socorro Independent School District.

APPENDIX: BRIGANCE TESTING RESULTS AND GRADE EQUIVALENTS

| YEAR & SCHOOL | 1994–95 (O'Shea) | 1995–96 (O'Shea) | 1996–97 (Final Yr. @ O'Shea) | 1997–1998 (First Yr. @ Bridges) |
|---|---|---|---|---|
| ANGELIC'S AGE | 10 | 11 | 12 | 13 |
| ACTUAL GRADE LEVEL | 3rd Grade | 4th Grade | 5th Grade | 6th Grade |
| WORD RECOGNITION | 1st Grade | 1st Grade | 2nd Grade | 3rd Grade |
| VOCABULARY COMPREHENSION | 1st Grade | 3rd Grade | 3rd Grade | 4th–5th Grade |
| ORAL READING | 1st Grade | 1st Grade | 3rd Grade | 3rd Grade |
| LISTENING VOCABULARY | 3rd Grade | 4th Grade | 4th Grade | 4th Grade |
| READING COMPREHENSION | 1st Grade | 1st Grade | 3rd Grade | 4th–7th Grade |
| LISTENING COMPREHENSION | 3rd Grade | 3rd Grade | 4th Grade | 4th Grade |
| SPELLING | 2nd Grade | 2nd Grade | 3rd Grade | 4th Grade |
| MATH | 2nd Grade | 2nd Grade | Apprx. 3rd Grade | 5th Grade |

SOURCES: Admin.Rec. Vol. I:19–22 (Summary of Brigance Scores); Admin.Rec. Vol. I:77–78 (Grade and Age Equivalents); IEP Summary Reports 1993–1997.