United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 26, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 04-20666

_____

SHELBY S, by next friend KATHLEEN T,

            Plaintiff-Appellant,

    v.

CONROE INDEPENDENT SCHOOL DISTRICT,

            Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas

_____

Before JONES, Chief Judge, and WIENER and PRADO, Circuit Judges.

Edward C. Prado, Circuit Judge:

    Plaintiff-Appellant Shelby S. ("Shelby") appeals the

district court's grant of summary judgment in favor of Defendant-

Appellee Conroe Independent School District ("CISD").  Shelby

contends that the district court erred in affirming the decision

of the Special Education Hearing Officer ("Hearing Officer").

The Hearing Officer concluded that there is a need for CISD to

perform a medical evaluation on Shelby in order to develop and

implement a special education program for her pursuant to the

Individuals with Disabilities Education Act ("IDEA").  The

Hearing Officer ordered that CISD be permitted to conduct a

medical evaluation of Shelby, despite objections from Shelby's guardian.  For the reasons that follow, we AFFIRM.

Background:

Shelby is a student in the CISD and is eligible to receive special education under the IDEA.  She suffers from a rare autonomic nervous system[1] disorder known as Dysautonomia that makes her medically-fragile: she is prone to sudden "crises" that can result in unconsciousness, cyanosis, cardiac arrest, and death.  Kathleen T. ("Ms. T") is Shelby's grandmother, guardian, and primary caregiver; she is most familiar with Shelby's physical cues that precede her crises and is the person most experienced in responding to such crises.  Shelby's treating physician is Dr. Dorothy Kelly.  Dr. Kelly is a pediatric pulmonologist and specialist in Shelby's disorder.

Shelby's autonomic nervous system dysfunction makes her susceptible to periods where she has decreased cardiac output. Shelby also has episodes where her larynx goes into spasms and she cannot get air into her lungs.  If left untreated, Shelby can die from one of these episodes.  In addition, Shelby is particularly sensitive to room temperature: if she is in a room where the temperature exceeds 72 degrees, she may experience life threatening symptoms. She can also experience an adverse reaction to emotional stressors or other stimuli.

---

[1] The autonomic nervous system regulates bodily functions and the activity of specific organs in humans.

Prior to the 2002-03 school year, Shelby was home-schooled and made only brief visits to school to socialize with the other children. At the beginning of the 2002-03 school year, Dr. Kelly reported that Shelby could attend school under certain conditions. On August 16, 2002, an Admission, Review, and Dismissal committee ("ARD committee") met and prepared an individualized education program ("IEP") report for Shelby.[2] Ms. T participated in the meeting and agreed with the recommendations. The ARD committee was given written information about Shelby's special health needs and requirements. The ARD committee agreed that Shelby would receive instruction in the mainstream education classroom, but with modifications for her needs. Additional support staff would be in Shelby's classroom and outside. Ms. T would be notified when Shelby had been administered Belladonna.[3] Special transportation would be

_____

[2] As we explained in *Cypress-Fairbanks Independent School District v. Michael F.*:

> The "free appropriate public education" that a disabled student is entitled to receive under the IDEA must be tailored to [her] particular needs by means of an "individual educational program" ("IEP"), a written statement prepared at a meeting attended by a qualified representative of the school district, a teacher, the child's parents or guardians, and, when appropriate, the child himself. In Texas, the persons charged with preparing an IEP are known collectively as an Admissions, Review and Dismissal Committee ("ARD Committee").

118 F.3d 245, 247 (5th Cir. 1997); *see* 20 U.S.C. § 1401(11) (2000) (amended 2004); § 1404(d).

[3] Belladonna is a drug that may be administered to Shelby when she goes into cardiac arrest.

3

initiated for Shelby on September 3, 2002; Ms. T would bring her to school until that date. There was no agreement that Ms. T, or any other aide, would attend classes with Shelby on a daily basis.

Shelby attended school that year for five days during the first two weeks of the 2002-03 class year. Ms. T accompanied Shelby to the classroom each day. Ms. T would sit at the back of the class, but would periodically go to Shelby's desk to talk to her and give her snacks. She also called to Shelby from the back of the room, reviewed the desks of other children, and commented to Shelby's teacher about other children. Ms. T sometimes left Shelby's class and her absences would last a few minutes to an hour.

On August 27, 2002, because Ms. T's presence was unacceptable to the administration at Shelby's school,[4] the principal of the school informed Ms. T she could no longer attend class with Shelby. As a result, Shelby did not return to class.

On August 28, 2002, Dr. Kelly sent a fax to Shelby's school, identifying Ms. T as Shelby's designated caregiver. Dr. Kelly gave instructions to the school that Ms. T was to train an appropriate classroom aide for Shelby and estimated that it would take about two to four weeks to train an aide. Dr. Kelly suggested that Ms. T accompany Shelby in the classroom in order

---

[4] According to Shelby's teacher, Ms. T's presence was disruptive in class.

4

to attend to her healthcare needs until an aide could be trained.

The ARD committee met on September 6, 2002, recessed and met again on September 26, 2002, to discuss Shelby's IEP and Dr. Kelly's fax. The purpose of the meetings was to address modifications to Shelby's IEP that were not addressed at the August 16, 2002 ARD committee meeting. At the September 6 meeting, the ARD committee requested permission to speak with Dr. Kelly regarding the need for supportive services in the classroom, but Ms. T limited her consent. Ms. T told the ARD committee to put its questions in writing — fourteen specific questions, subject to Ms. T's approval — to be delivered to Dr. Kelly. Ms. T edited Dr. Kelly's responses to the questions before they were provided to the ARD committee. She specifically limited the access between Dr. Kelly and members of Shelby's ARD committee because she was concerned about Shelby's privacy. Ms. T did allow the school nurse and Shelby's second grade teacher to talk to Dr. Kelly regarding the fourteen questions, for the purpose of obtaining information for educational purposes but not for prognosis.

The ARD concluded it needed additional information about Shelby, in order to reevaluate her IEP. The ARD committee asked Ms. T for consent to seek its own evaluation of Shelby. The ARD committee wanted to arrange for an outside medical evaluation by a Dysautonomia specialist. Ms. T refused consent on September 6, 2002. She claimed that the outside medical specialist's

5

anticipated examination of Shelby was likely to cause Shelby serious harm, and in any case, was unwarranted.

In September and November the school district and Ms. T remained in disagreement regarding whether Shelby's guardian needed to be present in the classroom, the proper accommodations for Shelby, and whether CISD would be able to conduct further evaluations. Shelby received instruction for the remainder of the school year as a homebound student.

Procedural History:

In February 2003, CISD requested that the Texas Education Agency hold a hearing, pursuant to the IDEA, so that it could proceed with its evaluation of Shelby in the absence of parental consent. CISD stated that Ms. T refused to send Shelby to school; Ms. T claimed Shelby's health status was fragile, and that Shelby risked serious injury or death if required to come to school without her guardian. CISD explained that it did not believe that Shelby's guardian needed to be present in the classroom. It stated it needed to perform a medical evaluation of Shelby to verify the nature and extent of her health problems.

The Hearing Officer, Stephen P. Webb, conducted a hearing in June 2003. He determined that because there was conflicting or missing information about Shelby's eligibility for special accommodations and support services, CISD was justified in attempting to augment its information about Shelby in order to develop an IEP that would meet her needs.

6

Shelby filed a complaint in district court, challenging the Hearing Officer's decision under the IDEA. Shelby asked the district court to find that CISD was not entitled to a medical evaluation without parental consent. CISD filed a motion to dismiss, and alternatively, for summary judgment. It argued that it is entitled to evaluate Shelby to determine the nature of her disability.

The district court determined that CISD was entitled to summary judgment and affirmed the Hearing Officer's decision that granted the school district the right to conduct an independent medical evaluation of Shelby. The district court entered final judgment on June 15, 2004. Shelby filed a motion for rehearing, which the district court denied. On August 5, 2004, Shelby timely filed her notice of appeal of the final judgment. On appeal, Shelby asks this court to review the district court's affirmance of the Hearing Officer's decision.

Standard of Review:

When we address a district court's review of a state hearing officer's decision in an impartial due process hearing under the IDEA, we treat mixed questions of fact and law *de novo* and review underlying fact-findings for clear error. *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 347 (5th Cir. 2000).

Discussion:

The issue before the court is: under what circumstances may

7

a school district compel a medical examination of a student, necessary for IDEA-mandated reevaluation purposes, when the student's guardian refuses consent?  The IDEA sets out a comprehensive scheme to evaluate each student in order to meet the IDEA's education goals.[5]  *See* 20 U.S.C. §§ 1400–1487.  After a designated period, or as need be, the IDEA requires reevaluations of each child educated under the act.  20 U.S.C. § 1414(a)(2)(2000)(amended 2004).[6]  However, prior to conducting any reevaluation, a local education agency must obtain informed parental consent.  20 U.S.C. § 1414(c)(3).  If the legal guardian of a child refuses consent, the local education agency may continue to pursue its evaluation through an impartial due process hearing.[7]

Under the circumstances at hand, CISD is entitled to perform a reevaluation of Shelby.  The IDEA states that a reevaluation is

---

[5] The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs."  20 U.S.C. § 1400(d)(1)(A) (2000)(amended 2004).  The applicable version of section 1400 was effective from June 4, 1997 to June 30, 2005.

[6] The applicable version of section 1414 was effective from July 1, 1998 to June 30, 2005.

[7] 20 U.S.C. § 1414(a)(1)(C)(ii) ("If the parents of such child refuse consent for the evaluation, the agency may continue to pursue an evaluation by utilizing the mediation and due process procedures under section 1415 of this title."); § 1414(c)(3)(applying subsection (a)(1)(C) to reevaluations); § 1415(f) (2000)(amended 2004) (providing for an impartial due process hearing).

warranted when the school district requires evaluation materials that are essential to assessing a child's special education needs. *See* 20 U.S.C. § 1414(c)(1)-(2). In order for CISD to know how to formulate an IEP consistent with Shelby's extreme symptoms, Shelby's ARD committee needed access to her medical history and specialist, Dr. Kelly. However, Shelby's guardian, Ms. T, limited the medical information that was available to Shelby's ARD committee by scripting the main encounter between Dr. Kelly and the ARD committee with fourteen pre-approved questions. Ms. T then edited Dr. Kelly's answers to the ARD committee's questions. Without more complete medical information about Shelby, the ARD committee was not able to fashion an IEP that would allow CISD to perform its IDEA-mandated duty.

The Hearing Officer and the district court concluded that CISD was within its right to evaluate Shelby in order to obtain necessary evaluation materials. We agree and conclude that where a school district articulates reasonable grounds for its necessity to conduct a medical reevaluation of a student, a lack of parental consent will not bar it from doing so.

Shelby also argues that allowing a medical evaluation without consent violates her right to privacy, but CISD's reevaluation of Shelby is not constitutionally problematic. Shelby is free to decline special education under IDEA rather than submit to CISD's medical evaluation. *See generally*, *Gregory*

9

*K. v. Longview Sch.* Dist., 811 F.2d 1307, 1315 (9th Cir. 1987) ("If the parents want Gregory to receive special education under the [IDEA],[8] they are obliged to permit [reassessment] testing. If the parents wish to maintain Gregory in his current private tutoring program, however, the District cannot require a reassessment.") (internal citations omitted).

AFFIRMED. We will treat CISD's Motion to Strike Appellant's Memorandum of Errors and for Sanctions as a motion to strike and GRANT the motion.

---

[8] In 1987, the relevant provisions were entitled the Education for All Handicapped Children Act.