**MARC V., by next friend Dr. Eugene V., et al., Plaintiffs,**

v.

**NORTH EAST INDEPENDENT SCHOOL DISTRICT, et al., Defendants.**

**Civil Action No. SA–05–CA–0619–XR.**

United States District Court,
W.D. Texas,
San Antonio Division.

Aug. 28, 2006.

Bill F. Fowler, Attorney at Law, San Antonio, TX, for Plaintiffs.

Miles T. Bradshaw, Jeffrey L. Rogers, Jo Ann Collier, Feldman & Rogers, L.L.P., Houston, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

RODRIGUEZ, District Judge.

On this date, the Court considered Defendants' motion for summary judgment (docket no. 18), Defendants' supplement to its motion for summary judgment (docket no. 39), Plaintiffs' motion for partial summary judgment (docket no. 30), Defendants' motion to limit additional evidence (docket no. 48), and Defendants' motion to strike Plaintiffs' expert reports and testimony (docket no. 50). After careful consideration, Defendants' motion for summary judgment is GRANTED (docket no. 18, docket no. 39). Plaintiffs' motion for partial summary judgment is DENIED (docket no. 30). Defendants' motion to limit additional evidence is GRANTED (docket no. 48). Defendants' motion to strike Plaintiffs' expert reports and testimony is GRANTED (docket no. 50).

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Marc V. and his parents Dr. Eugene V. and Mu-hsian V. appeal a November 19, 2004 decision of a special education hearing officer in a Texas Education Agency ("TEA") proceeding (TEA docket no. 400–SE–0804) filed under the Individuals with Disabilities Education Act, 20 U.S.C. § § 1400 et seq. ("IDEA"). Plaintiffs brought this action against Defendants Northeast Independent School District ("NEISD"), the NEISD Board of Trustees ("the Board"), Richard A. Middleton, Judith Higgins, Colleen McLaughlin, Gloria Kutach, Karen Pritt, and Jackie Lee alleging violations of the IDEA, 42 U.S.C. § 1983 ("Section 1983"), section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), and the Americans with Disabilities Act, 42 U.S.C. § 12131 ("ADA").

The acrimonious history between Marc's parents and NEISD began in fall 2002. In September 2002, NEISD, on the referral of Marc's parents and the Brighton School (a private school from which Marc had been receiving Early Childhood Intervention services) began evaluating Marc for enrollment. On October 4, 2002, an Admission, Review, and Dismissal ("ARD") committee meeting convened to develop Marc's educational goals and objectives. In Texas, the ARD committee is charged with preparing a student's individual education plan ("IEP"), which is a written statement of the disabled child's present level of academic achievement, measurable annual educational goals, and special education, related services, and other accommodations to be provided to the child. *See Adam J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir.2003). The ARD committee is comprised of the disabled child's parents, at least one special education teacher and/or one regular education teacher, a representative of the school district, someone who can provide insight into the instructional implications of the child's clinical evaluation, and, when appropriate, other individuals with special knowledge or expertise related to the child and the child himself. *Id.*

The ARD committee concluded that Marc qualified for special education services. Tr. 216. An interim IEP was developed that called for Marc to be placed

in a half-day program in the self-contained Preschool Program for Children with Disabilities ("PPCD") classroom at NEISD's Oak Grove Elementary School campus and to receive one-hour per week of speech therapy. Tr. 216–17. The IEP set forth several cognitive, socialization, language and speech related goals, including: (1) 36–48 month level cognitive skills, such as stating first name, pointing to and/or vocalizing wants, and carrying out three compliance commands and one-step directions; (2) 36–48 month level socialization skills, such as cooperating with adult requests, playing alone or with peers in centers, and engaging in cooperative play; (3) 36–48 month level language skills, such as comprehending commands and participating in PPCD classroom routines and procedures; (4) acquiring developmentally appropriate communication skills needed for personal, social, and/or educational control; (5) acquiring communicative holophrases; and (6) mastering developmentally appropriate auditory attention, discrimination, sequential memory, and/or recall. Tr. 218–21. A finalized IEP was to be implemented within thirty school days (or six weeks). Tr. 216. Marc's parents agreed with his initial placement. Tr. 222.

Following his initial enrollment, NEISD Educational Diagnostician Katie Coleman completed a Full and Individual Evaluation ("FIE") on November 18, 2002. Tr. 223–32. The FIE allowed NEISD to further assess Marc's needs for special education intervention. Tr. 223. It was determined that Marc met the TEA's guidelines for Noncategorical Early Childhood disability and should receive special education services with "[m]ore classroom structure and supervision than is possible with only general education support ... [,][s]pecialized methods, materials or modified instructional content as needed to address Marc's learning disability ... [, and]

[s]maller class size and/or more individual support." Tr. 231.

On November 26, 2002, the ARD committee reconvened with Marc's parents to review the FIE and establish Marc's permanent placement within NEISD. Tr. 233. Based on the FIE, the ARD committee classified Marc as a special education student with non-categorical early childhood and speech impairment disabilities. Tr. 236. Marc's IEP was not changed at that time, however, because the ARD committee determined that he was already receiving the necessary education services and was making progress. Tr. 242–45. The committee did increase the number of objectives/education goals Marc should master throughout the course of the year. Tr. 246–53.

The meeting minutes reveal that Marc's parents were concerned about "the possibility of autism" and requested Marc be evaluated. Tr. 242. Marc's parents noted that previous doctors had suspected mild autism. Tr. 242. Although the FIE testing did not support an autism diagnosis, the ARD committee, at Marc's parent's request, agreed to perform additional autism testing. Tr. 244–45, 256. Further testing to determine whether Marc was a candidate for occupational therapy was to be completed within sixty school days. Tr. 236.

In January 2003, a three-person NEISD multi-discipline team conducted a Psychoeducational Profile Revised and Childhood Autism Rating Scale tests to determine whether Marc was autistic. Tr. 258. In a report dated March 17, 2003, the three-person team determined Marc met TEA's guidelines for "Autism and other pervasive developmental disorders." Tr. 263. Neither party disputes that Marc is autistic.

Prior to receiving NEISD's autism determination, Marc's parents had him inde-

pendently assessed by Dr. Patricia Harkins, a board certified developmental and behavioral pediatrician. In a March 21, 2003 report, Dr. Harkins (without benefit of NEISD's March 17 report) diagnosed Marc with moderate autism spectrum disorder and made several recommendations regarding an "intensive therapy program." Tr. 276. These recommendations included:

a. Applied Behavioral Analysis therapy—minimum of 10 hours per week[;]

b. Minimum of 2 hours per week of one on one speech and language therapy using a total communication system, including PECS, sign, and verbal interactions[;]

c. Minimum of 2 hours per week of one on one occupational therapy to include fine motor skills and sensory integration skills[; and]

d. Strong home programs in each area of intervention to extend their impact[.]

Tr. 274. Dr. Harkins also recommended Marc be placed with "typical peers, including a teacher's assistant whose primary tasks are to monitor Marc for stress, on task behavior, and to assist socialization and classroom modifications." Tr. 275. Marc's mother conveyed these recommendations in a March 24, 2003 letter to Defendant Higgins, NEISD's director of special education. Tr. 276.

On April 4, and continuing on April 11, 2003, the ARD committee reconvened to discuss the impact of Marc's autism diagnosis, including Dr. Harkins' recommendations, on his current IEP. Tr. 280. The ARD committee amended Marc's IEP in several areas: (1) in addition to attending the PPCD classroom for three hours per day, Marc would also attend a pre-kindergarten classroom for three hours per day; (2) one-half hour per week of occupational therapy consultation services was added; (3) speech therapy was increased from one hour to two hours per week, and (4) two hours per week of in-home and parent training. Tr. 285, 287, 294. In addition, beginning in June 2003, Marc would receive Extended School Year ("ESY") services at the Brighton School and one and one-half hours per week of speech therapy. Tr. 303. Marc's parents also requested that he be tested for music therapy.

On May 30, 2003, the ARD committee and Marc's parents met once again to review a music therapy evaluation, make clarifications to the recommendation for occupational therapy services, and discuss ESY services. Tr. 329. The committee determined that music therapy in the school setting was not needed to implement Marc's IEP. Tr. 329. The ARD committee amended Marc's ESY services at the Brighton School to include three hours per day/five days per week in a prekindergarten classroom with related speech (two hours per week) and occupational therapy services. Tr. 331. A home training/parent training assessment was scheduled for June at Marc's parent's request. Tr. 331. Although the committee and Marc's parents agreed to wait to finalize Marc's 2003–2004 school year schedule until August, Marc's parents noted they were very happy with their son's progress in the pre-kindergarten and speech therapy classes at Oak Grove Elementary and would probably request that placement again. Tr. 331.

Throughout the summer of 2003, Marc attended the Brighton School in a day care setting with typically developing children. Tr. 335. Marc's teacher noted that he "made some great progress this summer," but "can still improve." Tr. 335. Marc's parents and Dr. Harkins also noted his significant education progress over the summer.

On August 14, 2003, an ARD committee meeting was held with Marc's parents to develop Marc's 2003–2004 IEP. Tr. 337. Marc's parents opened the meeting by reading a "Parental Statement" regarding their expectations for Marc's IEP during the 2003–2004 school year. Tr. 361–62. The statement concluded that "[t]his program for fall 2003 continues to build on the success of spring and summer; and strives for the best fit between capabilities and needs; and, finally is best for Marc as his critical fourth year starts." Tr. 362. The ARD committee determined the following IEP should be implemented: (1) placement in a pre-kindergarten classroom for two hours forty-five minutes per day; (2) placement in the PPCD classroom for three hours per day; (3) 1:1 speech therapy for two-and-one-half hours per week; (4) thirty minutes of occupational therapy per week; and (5) in-home and parent training for twenty-four hours per month and two hours per week, respectively. In an attempt to have the committee reconsider their decision to not approve music therapy, Marc's parents presented a private music therapy evaluation obtained over the summer. Tr. 345–48. The ARD committee agreed to consider the music evaluation at another meeting in a week or two. Tr. 348.

The ARD committee and Marc's parents met to consider his need for music therapy on August 29, 2003. Tr. 365. It was agreed that Marc would receive one-half hour per week of music therapy on a consultative basis. Tr. 365. The meeting minutes indicate that "the [ARD] committee agrees these program [and] services ... are the most appropriate to meet Marc's current needs." Tr. 370.

On September 14, 2003, Marc's father wrote a letter to Defendant Colleen McLaughlin, the principal of Oak Grove Elementary School, praising the work of Defendant Gloria Kutach (Marc's pre-kindergarten teacher) and Defendant Karen Pritt (Marc's classroom "shadow"):

Marc has fit well into the class and has made friends amongst his classmates. With normally-developing peers to emulate, Marc eats, marches, and assembles based on the clear and consistent direction of Ms. Kutach. She provides enthusiastic, unmistakable, and effective class leadership that her students find appropriate and stimulating. Accordingly, Marc takes tasks and assignments similar to other students and clearly derives satisfaction from their completion. Friday's class which included Marc's fourth birthday party was particularly happy for our son.

Under the watchful eye of Ms. Pritt, Marc has developed skills and a sense of achievement from a variety of daily tasks, including self feeding, staying on task, and concentration. My wife has noticed coping skills that Marc did not previously posses[s].

Tr. 382. Despite their expressed happiness over Marc's pre-kindergarten class, Marc's parents harbored deep concerns over his PPCD class. Tr. 383, 385. Specifically, Marc's parents were concerned with the allegedly violent behavior of other, much larger, students in their son's class. Tr. 383, 385. In a letter dated September 15, 2003, Marc's mother informed McLaughlin that they were withdrawing Marc from the PPCD class effective September 12, 2003. Tr. 383–84. On September 16, 2003, Marc's father wrote a similar letter stating that "[w]hen the class becomes safe and appropriate for learning, Marc will return and fulfill the stipulations of the last ARD." Tr. 385. In a September 26, 2003 letter to McLaughlin, Marc's father alleges "some requirements of Marc's IEP were not carried out" in the PPCD classroom, but reiterated his "confidence

in [McLaughlin's] leadership and want [ed][her] to know that [they] [were] extremely pleased with Marc's morning pre-K class, his shadow, and services received." Tr. 386. Marc's mother wrote another letter on September 27, 2003 praising Defendant Pritt's work as Marc's shadow. Tr. 388.

Beginning in mid-October 2003, Marc's attendance in his pre-kindergarten class became sporadic. Marc, however, continued to receive all of his related services from NEISD, including speech, occupational, and music therapy. On or about October 27, 2003, Marc stopped coming to school on most days. The decision to remove Marc from school was largely motivated by allegations that Marc was mistreated by a school aide, Ms. Pritt, during the fall semester of 2003. Tr. 389–484. This alleged mistreatment included allegations of force feeding, rough handling, and indifference to Marc's emotional state. Tr. 389–484.

Although Marc had not been regularly attending Oak Grove Elementary, an ARD committee meeting was convened on November 19, 2003 to review and develop new IEP goals for Marc's speech therapy. Tr. 628. Marc had mastered five out of eight speech goals. Tr. 635–36. Marc's mother agreed that the remaining three goals would be continued and worked with NEISD's speech pathologist to develop new IEP goals for speech. Tr. 630. The remainder of Marc's August 2003 IEP remained in place. Tr. 628.

The ARD committee reconvened in January 2004 to review Marc's IEP and discuss his placement at a different elementary school. Tr. 661. The committee recommended transferring Marc from Oak Grove Elementary to Redland Oaks Elementary. Tr. 661. Because Marc has difficulty with changing routines, the committee determined he should be slowly phased into the prekindergarten program. Tr. 661. Marc's new IEP included: (1) 3 hours per day in the prekindergarten classroom (after the initial phase-in process was completed); (2) 1 hour per week in the PPCD; (3) 125 minutes per week of speech therapy; (4) 30 minutes per week of occupational therapy; and (5) in-home and parent training for 24 hours per month and 2 hours per week, respectively. Tr. 657, 658. Marc's music therapy was discontinued. Tr. 661. Marc enrollment at Redland Oaks was to begin on February 2, 2004. Marc's parents, while generally agreeing with Marc's IEP, objected to numerous sections of the ARD committee meeting minutes and Marc's progress reports. Tr. 664–66.

As they had throughout his enrollment in NEISD, one or both of Marc's parents accompanied him throughout his school day at Redland Oaks. Tr. 1185. The principal of Redland Oaks Elementary, Defendant Jackie Lee, initially allowed Marc's parents to attend class with him, but their continued presence was disrupting the class and hindering the education process for each student, including Marc. Tr. 1185–86. On February 25, 2004, Defendant Lee informed Marc's parents that they would "no longer be allowed to sit in Marc's class throughout the period each school day. However, you may choose one day each week to observe Marc in his classroom for 30 minutes without having any conversation with the staff members or students." Tr. 1187. Lee assured Marc's parents that he would "continue to do well at Redland Oaks. His teachers report that Marc appears to be quite comfortable with his teachers, classmates, and surroundings." Tr. 1187.

Being barred from accompanying Marc throughout the school day apparently was the last straw for his parents. On February 27, 2004, Marc's father notified Lee

that he and his wife were distressed by the restrictions on their classroom attendance, but it did not matter because "as Marc's difficulty in recovering from the traumas he suffered at Oak Grove Elementary School makes inappropriate his continued placement in Redland Oaks Elementary School. We enclose a recent assessment from Marc's Pediatrician prescribing Home Bound placement for Marc, and we respectfully ask that Dr. Harkin's prescription be honored for the sake of Marc's health and recovery." Tr. 668. The enclosed homebound placement from Dr. Harkin's was dated February 16, 2004.

Although not known by NEISD, Dr. Harkins, in a January 15, 2004 report, diagnosed Marc with post-traumatic stress disorder ("PTSD") and recommended that "[s]chool placement should be homebound for the foreseeable future." Tr. 647. Dr. Harkins relied on "reports of inappropriate handling of Marc at school, including force feeding, [and] rough handling" in arriving at her PTSD diagnosis. Tr. 646. Dr. Harkins noted that Marc had severely regressed from his summer progress and "should not attend the same. educational setting." Tr. 646. It is not clear when Marc's parents learned of this prognosis, or why they did not immediately report it to NEISD.

On March 4, 2004, Marc's father questioned why NEISD had not honored Dr. Harkins' homebound placement prescription and requested an expedited ARD meeting:

> Marc's illness is too severe and his health too precarious to risk his placement in Redland Oaks without extensive monitoring by his parents. Your prohibition against our extensive monitoring requires that we school Marc at home while Home Bound services are being arranged.

Tr. 670. Less than a week later, Marc's parents permanently withdrew him from Redlands Oaks. Tr. 671.

On March 10, 2004, the ARD committed convened to discuss Marc's homebound placement. Tr. 676–96. The committee requested parental consent to speak with Dr. Harkins regarding her prescription for homebound placement. Tr. 682. Marc's parents would not consent. Tr. 682. The ARD committee reconvened on March 29 to further discuss homebound placement. Tr. 684. Marc's parents again refused to give consent and would continue to consider whether consent would be given. Tr. 684. The committee meeting minutes indicate that NEISD continued to offer services for Marc. Tr. 684. Based on the information available, the committee wanted to continue to implement Marc's January 28, 2004 IEP and "ha[d] not placed Marc on homebound." Tr. 684–85 ("Again, given the info as of now, the program offered on 1/28/04 for Marc would continue to be appropriate.... Without additional info from Dr. Harkins ... or a psychological assessment, justification for such a restrictive program as homebound has not been determined.").

The ARD committee convened once again on April 12, 2004 to further evaluate whether Marc would benefit from a homebound placement. Tr. 686–90. Marc's parents once again refused to allow NEISD to confer with Dr. Harkins regarding her homebound prescription. Further discussion was held regarding homebound placement, but the committee continued to assert that "the best place to meet [Marc's] needs are within a school setting with related services as specified." Tr. 689. Marc's parents declined signing the ARD committee meeting minutes. Tr. 689.

On April 17, 2004, Marc's father drafted an addendum to be included with the April

12, 2004 ARD committee meeting minutes. Tr. 697. In addition to making several alleged corrections to inaccuracies in the meeting minutes, Marc's father challenges NEISD's assessment that Marc was making good progress. Tr. 698. The addendum concludes that "though the ARD Committee Report suggested the possibility of re-introducing Marc back into school on a piecemeal schedule, the beginning suggested attendance schedule is excessively long, and no attendance would be acceptable at present so long as Marc's parents are excluded from observing him in class." Tr. 698.

Although Marc did not return to Redland Oaks Elementary after his parents withdrew him on March 10, 2004, NEISD continued to provide in-home and parent training through June 30, 2004. Efforts by Marc's parents and NEISD throughout the summer failed to resolve the disagreement on Marc's placement. Marc's parents and NEISD attempted to conduct another ARD to establish Marc's IEP for the 2004–2005 school year, but the meeting never took place.

On August 13, 2004, Plaintiffs filed their request for a due process hearing alleging that NEISD had denied Marc a free appropriate public education ("FAPE"). Plaintiffs sought homebound placement with continuation of appropriate supplementary and related services at district expense, compensatory tutorial instruction, compensatory damages, punitive damages, and their costs and attorneys' fees. Tr. 186–87. On November 19, 2004, the hearing officer issued his final decision denying all relief requested by Plaintiffs. Tr. 4–10. The hearing officer determined, *inter alia*, that (1) Plaintiffs' claims arising prior to one year from the date of the filing of the request for hearing on August 13, 2004, are barred by the one-year statute of limitations found in 19 TEX. ADMIN. CODE § 89.1151(c); (2) the IEPs for Marc developed by NEISD for the 2003–2004 school year were properly developed by ARD committees for Marc and provided him an educational placement with related services reasonably calculated to enable him to receive educational benefit under the *Rowley* and *Michael F.* standards; (3) Plaintiffs failed to meet their burden of proving that the educational program provided by Respondent for Marc was inappropriate; and (4) the educational placements for Marc provided by Defendants were appropriate and in the least restrictive environment appropriate for him under the *Daniel R.R.* standard. Tr. 5–6.

On June 30, 2005, Plaintiffs Marc V. (Marc V.) by next friend, Dr. Eugene V., his father, and Dr. Eugene V. individually (collectively, "Plaintiffs"), filed suit against North East Independent School District ("NEISD"), the Board of Trustees and several employees of the school district (collectively, "Defendants") as aggrieved parties under the Individuals with Disabilities Education Act (IDEA). Plaintiffs' Original Complaint also alleged violations of section 504 of the Rehabilitation Act of 1973 (Section 504), Title II of the Americans with Disabilities Act (ADA), and Title 42 United States Code section 1983.

## II. LEGAL ANALYSIS

**A. The Fifth Circuit would probably adopt the *Town of Burlington* standard in determining the scope of the IDEA's "additional evidence" provision.**

In reviewing the hearing officer's decision, the Court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the Court determines is ap-

propriate. 20 U.S.C. § 1415(i)(2)(C)[1]. Although the statute states that the Court shall hear additional evidence at the request of the parties, several circuits have held that limits exist to the extent of additional evidence that a party may submit to the reviewing court under this "additional evidence" provision. In *Town of Burlington v. Department of Education for the Commonwealth of Massachusetts*, the First Circuit discussed the limitations of the IDEA's "additional evidence" provision. 736 F.2d 773, 790 (1st Cir.1984). The court construed the term "additional" in the ordinary sense of the word, to mean "supplemental." *Id.* "Thus, construed, this clause does not authorize witnesses at trial to repeat or embellish their prior administrative hearing testimony. . . ." *Id.* The reasons for why a party may seek the opportunity to present additional evidence will vary:

> [T]hey might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing. The starting point for determining what additional evidence should be received, however, is the record of the administrative hearing.

*Id.* Although the *Burlington* court declined to adopt a rigid rule precluding the testimony of all who did, or could have, testi-fied at the administrative hearing, it noted that exclusion would be the proper result in the majority of cases. *Id.* "In ruling on motions for witnesses to testify, a court should weigh heavily the important concerns of not allowing a party to undercut the statutory role of administrative expertise, the unfairness involved in one party's reserving its best evidence for trial, the reason the witness did not testify at the administrative hearing, and the conservation of judicial resources." *Id.* at 791. "The determination of what is additional evidence must be left to the discretion of the trial court which must be careful not to allow such evidence to change the character of the hearing from one of review to a trial de novo." *Walker County Sch. Dist. v. Bennett*, 203 F.3d 1293, 1298 (11th Cir. 2000) (quoting *Town of Burlington*, 736 F.2d at 791).

The "additional evidence" Plaintiffs seeks to admit comes in the form of eight fact witnesses, one expert witness, and six exhibits. Plaintiffs' designated fact witnesses who did not testify in the administrative hearing are (1) Richard Middleton, NEISD Superintendent; (2) Sandy Hughey, NEISD Board Member; (3) Katie Coleman, NEISD Assessment Representative, Oak Grove; (4) Jan Longfellow, Campus / Program Coordinator, Oak Grove; (5) Peggy Hannon, Campus / Program Coordinator, Oak Grove; (6) Cheryl Moore, Music Therapist, Oak Grove; (7) Jennifer Ozuna, Intake Evaluator for

---

1. This citation keys to the current version of the IDEA, effective on July 1, 2005; however, this case must be decided under the prior version of the IDEA, which was effective April 29, 1999 to June 30, 2005. Under the prior version of the IDEA, the "additional evidence" provision was found at 20 U.S.C. § 1415(i)(2)(B) (prior version). Interestingly, the current version of the IDEA contains a 90 day statute of limitations for appeals to the district court. 20 U.S.C. § 1415(i)(2)(B) (current version). Although this appeal of the hearing officer's decision would be subject to a 90 day statute of limitations defense under the current version of the IDEA, the statute of limitations on appeals to the district court under the prior version of the IDEA is two years. *Texas Advocates Supporting Kids with Disabilities v. Tex. Educ. Agency*, 112 S.W.3d 234, 240–41 (Tex.App.—Austin 2003, n.w.h.) (citing *Scokin v. Texas*, 723 F.2d 432, 435–39 (5th Cir.1984)). All citations in this Order key to the current version of the IDEA for ease of reference.

Marc; and (8) Gloria Kutach, Marc's Pre–K teacher in 2003. Plaintiffs also designated an expert witness who did not testify in the administrative hearing, Dr. Bruce D. Perry, M.D., Ph.D. Defendants move to limit any additional evidence and to strike Plaintiffs' expert reports and testimony (docket no. 48, docket no. 50). Plaintiffs argue that Defendants' position that no additional evidence should be admitted "would indeed reverse Fifth Circuit law because such restrictions are forbidden in extant Fifth Circuit IDEA precedent." The Court disagrees. The Fifth Circuit has yet to address the scope of the IDEA's "additional evidence" provision. Plaintiffs' reliance on the Fifth Circuit's restatement of IDEA statutory provisions regarding additional evidence in no way restricts the Court's discretion to disallow any of their proposed evidence.

█ Although the Fifth Circuit has yet to define the precise contours of the IDEA's additional evidence provision, the Court believes that the Fifth Circuit would adopt the *Town of Burlington* standard because it represents the majority approach. The First Circuit, the Eighth Circuit, the Ninth Circuit, and the Eleventh Circuit utilize the *Town of Burlington* standard in determining the extent of record supplementation allowed under the IDEA's "additional evidence" provision. *Town of Burlington,* 736 F.2d at 790 (1st Cir.1984); *see Indep. Sch. Dist. No. 283 v. S.D. ex rel. J.D.,* 88 F.3d 556, 561 (8th Cir.1996) (citing to First Circuit precedent and stating that parties need "solid justification" for supplementing the administrative record); *Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d 1467, 1472–73 (9th Cir. 1993); *Walker County,* 203 F.3d at 1299 (11th Cir.2000); *Sch. Bd. of Collier County, Fla. v. K.C.,* 285 F.3d 977, 981 (11th Cir.2002). The Third Circuit has stated that a district court should consider additional evidence that is "relevant, non-cumulative, and useful." *Susan N. v. Wilson Sch. Dist.,* 70 F.3d 751, 760 (3rd Cir.1995). The Fourth Circuit has stated that "[a] lenient standard for additional evidence would have the consequence of making the whole IDEA process more time consuming, as parties scramble to use the federal court proceeding to patch up holes in their administrative case." *Springer v. Fairfax County Sch. Bd.,* 134 F.3d 659, 667 (4th Cir.1998). In short, the general consensus is that the IDEA's "additional evidence" provision is limited, and the decision of whether to allow additional evidence is discretionary with the district court.

The Eighth Circuit stated that the IDEA permits a reviewing court to admit additional evidence to supplement the record if a party has a solid justification for doing so; however, rendering a decision on the record compiled before the administrative agency is the norm. *Indep. Sch. Dist. No. 283,* 88 F.3d at 561; *West Platte R–II Sch. Dist. v. Wilson,* 439 F.3d 782, 785 (8th Cir.2006). *West Platte* was significant because the Eighth Circuit affirmed a district court's decision to entirely preclude the school district from supplementing the administrative record. 439 F.3d at 785. The court stated the following:

> The additional evidence that the District attempted to provide related to the progress and status of L.W. subsequent to the administrative hearing. The district court concluded that the District failed to provide a solid justification for supplementing the administrative record. Considering the vast and detailed administrative record that was compiled, together with the fact that we normally determine these issues based solely on the administrative record, we conclude that the district court did not abuse its discretion in denying the District's request to supplement the record.

*Id.* West Platte supports the position that a court may entirely preclude "additional evidence" supplementation under the *Town of Burlington* standard even if a party requests the admission of additional evidence under 20 U.S.C. § 1415(i)(2)(C).

The First Circuit has further refined the Town of Burlington standard as it relates to a district court's decision to disallow the admission of additional evidence. In evaluating a district court's decision to exclude the additional testimony of three expert witnesses, the Court stated that "we refuse to reduce the proceedings before the state agency to a mere dress rehearsal by allowing appellants to transform the Act's judicial review mechanism into an unrestricted trial *de novo.*" *Roland M. v. Concord Sch. Comm.,* 910 F.2d 983, 997 (1st Cir.1990). It is an appropriate limit, in many cases, to disallow testimony for all who did, or could have testified before the administrative hearing. *Id.* (citing *Town of Burlington,* 736 F.2d at 790). In absence of special circumstances, courts should ordinarily exercise that discretion in favor of excluding the belatedly offered evidence. *Id.* Even the Sixth Circuit, which has refused to adopt the *Town of Burlington* standard, stated that the determination of which additional evidence to allow rests within the sound discretion of the court, "which should take care to limit additional evidence to what is necessary for consideration of whether the original IEP was reasonably calculated to afford some educational benefit." *Deal v. Hamilton County Bd. of Educ.,* 392 F.3d 840, 850 (6th Cir.2004).

■ In their responses to Defendants' motion to limit additional evidence and motion to strike, Plaintiffs repeatedly cite to Fifth Circuit cases that quote or paraphrase the statutory language of 20 U.S.C. § 1415(i)(2)(C). Contrary to Plaintiffs assertions, these Fifth Circuit cases do not clearly hold that the Court *must* hear additional evidence whenever it is requested by a party. In fact, the one Fifth Circuit case that comes closest to analyzing the "addition evidence" provision instead of paraphrasing it stated the following: "We hold that ... the district court *may* take additional evidence and reach an independent conclusion based upon the preponderance of the evidence." *Teague Indep. Sch. Dist. v. Todd,* 999 F.2d 127, 131 (5th Cir. 1993) (emphasis added).

The Court refuses to admit Plaintiffs' additional evidence because that evidence is (1) cumulative; (2) or irrelevant; (3) or bolstering of existing evidence, (4) or untimely proffered. The Court refuses to admit the testimony of Plaintiffs' eight additional fact witnesses because their identity was known by Plaintiffs prior to the hearing and Plaintiffs could have called them to testify. Each of the nine additional witnesses was known to Plaintiffs prior to the hearing; indeed, eight of the witnesses were specifically listed as potential witnesses in Plaintiffs' pre-hearing disclosures. Tr. 35–41. The eight exhibits that Plaintiffs seek to introduce as additional evidence were also in existence prior to the administrative hearing and could have been presented in the administrative hearing through the exercise of diligence. *See Jones v. Bd. of Educ. Of Washington County,* 15 F.Supp.2d 783, 786 (D.Md. 1998) (noting that Plaintiffs did not give Court any indication as to what the additional evidence might consist of or why it had not been offered at the administrative hearing). The Court believes that Plaintiffs additional evidence is cumulative or bolstering of existing evidence. In absence of special circumstances, the Court will ordinarily exercise its discretion in favor of excluding belatedly offered evidence.

In both their response to Defendants' motion to limit additional evidence and their response to Defendants' motion to strike Plaintiffs' expert reports and testimony, Plaintiffs have failed to provide "solid justification" for supplementing the existing record. The Court notes that the hearing officer admitted over 140 exhibits and heard testimony from 18 live witnesses, in addition to considering other evidence presented by Plaintiffs that included deposition testimony of two witnesses and transcribed recorded statements or affidavits of seven other witnesses. The administrative record consists of five volumes totaling more than 1,427 pages.[2] The Court simply does not need to admit additional evidence in order to determine whether Marc's IEP was reasonably calculated to afford him some educational benefit.

Plaintiffs did give three plausible justifications for admission of additional evidence in their responses: (1) the hearing officer imposed certain limits on the amount of evidence admitted at the hearing; (2) Dr. Perry was unavailable to attend the hearing because he was attending a conference in Canada; and (3) Ms. Kutach could not be located at the time of the due process hearing. The Court finds that the limitations imposed by the hearing officer were minimal and provided Plaintiffs with ample opportunity to develop their case. Plaintiffs have failed to state what additional evidence any of their designated witnesses, including Dr. Perry and Ms. Kutach, would provide to the Court that is not irrelevant, cumulative, or bolstering of existing evidence. Dr. Perry's opinion letter only appears bolstering of Dr. Harkins testimony, and Dr. Perry only appears to have evaluated Dr. Harkins diagnosis, not Marc himself. Consequently, the Court

finds that their additional testimony is unnecessary.

Defendants' motion to limit additional evidence is GRANTED (docket no. 48), and Defendants' motion to strike Plaintiffs' expert reports and testimony is GRANTED (docket no. 50). Plaintiffs additional evidence is cumulative; or bolstering of existing evidence; or irrelevant; or untimely proffered because the witnesses were available to testify at the due process hearing.

**B. The hearing officer was correct in concluding that the one-year statute of limitations found in 19 TEX. ADMIN. CODE § 89.1151(c) precludes petitioner from asserting claims arising prior to one year from the date of the filing of the request for a due process hearing on August 13, 2004.**

■ In the hearing officer's third conclusion of law, he held that Petitioner's claims arising prior to one year from the date of filing of the request for hearing on August 13, 2004, were barred by the one-year statute of limitations. Tr. 8. 19 TEX. ADMIN. CODE § 89.1151(c) states that "[e]ffective with requests for due process hearings filed on or after August 1, 2002, a parent or public education agency must request a due process hearing within one year of the date the complainant knew or should have known about the alleged action that serves as the basis for the hearing request." The hearing officer found that Marc's parents were provided with information about special education services and their rights under federal regulations for special education students in September of 2002. Tr. 5. This finding of fact is supported by the evidence. During the administrative hearing, both the Petitioners (Tr. 198, Tr. 199) and the Respondents (Tr. 852, Tr. 853) admitted exhibits demon-

---

**2.** The Court notes that volume III of the administrative record ends with a stamped page number of 1,427. Inexplicably, volumes IV and V do not continue this stamped pagination. The Court estimates that the entire record constitutes approximately 2,000 pages.

strating that Marc's parents received notice of the procedural protections afforded to students with disabilities under the IDEA on September 16, 2002. On that date, Marc's parents gave the District their "Request for Consent for Full and Individual Evaluation" and the District gave Marc's parents its "North East Independent School District Notice of Full and Individual Evaluation." Marc's parent signed the request for consent, which stated at the bottom of the form that "[y]our rights were explained to you when you were / your child was initially referred for special education evaluation. Federal regulations require that parents and adult students be provided a full explanation of procedural safeguards.... Another copy of the procedural safeguards (rights) is included with this form." Tr. 198, 199, 852, 853. The Court finds that Marc's parents were on notice concerning the procedural protections provided under the IDEA as of September 16, 2002. The one-year statute of limitations applies to Plaintiffs because they knew or should have known about any alleged violation of the IDEA occurring after September 16, 2002 that would entitle them to a due process hearing.

Plaintiffs filed their request for a due process hearing on August 13, 2004. The Texas one-year statute of limitations "requires a [P]laintiff to request a hearing each year to address any procedural or substantive violations which may have occurred the prior year." *Alexandra N. v. Desoto Indep. Sch. Dist.*, 2005 U.S. Dist. LEXIS 15122, *7–8 (N.D.Tex. July 25, 2005). Given the unambiguous language of the statute of limitations, the Court must affirm the hearing officer's decision that the statute of limitations precludes recovery for any procedural violations occurring prior to one year from the date that Plaintiffs filed their request for a due process hearing. *Id.* at *8. Consequently, the only issue is whether the District provided Marc with a FAPE between August 13, 2003 and August 13, 2004. Plaintiffs' claims concerning child-find violations [3] and any other procedural or substantive violations of the IDEA occurring prior to August 13, 2003 are time-barred under 19 *Tex. Admin. Code* § 89.1151(c). Plaintiffs' Section 1983, Section 504, and ADA claims based on events occurring prior to August 13, 2003 are time-barred because those claims are based on time-barred IDEA violations. Plaintiffs cannot resuscitate time-barred IDEA claims by re-casting them as Section 1983, Section 504, or ADA claims.[4]

**C. Plaintiffs IDEA, Section 1983, Section 504, and ADA claims arising after August 13, 2004 are barred by the IDEA's administrative exhaustion requirement.**

 A complaint based on the IDEA is not a justiciable controversy until Plain-

---

**3.** Plaintiffs argue that the Texas Administrative Code and the IDEA require that the District make IDEA services available to eligible students on their third birthday and that the District hold a mandatory early planning conference 120 days before the child's third birthday. Plaintiffs allege that the District failed to meet these "child-find" deadlines; however, these IDEA claims are time-barred because they occurred during the summer or early fall of 2002.

**4.** Since the one-year statute of limitations prevented Plaintiffs from addressing their time-

barred IDEA claims at the due process hearing, the Court cannot consider those claims because of the IDEA's administrative exhaustion requirement, discussed *infra*. Furthermore, since the Court cannot consider Plaintiffs' time-barred IDEA claims because of the administrative exhaustion requirement, the Court also cannot consider Plaintiffs' derivative Section 1983, Section 504, and ADA claims based upon the time-barred IDEA claims. *See Eddins v. Excelsior Indep. Sch. Dist.*, 1997 WL 470353, at *9, 1997 U.S. Dist. LEXIS 12091, *28 (E.D.Tex. Aug. 6, 1997).

tiffs have exhausted their administrative remedies under the IDEA or proved that exhaustion would be futile or inadequate. 20 U.S.C. § 1415(*l*); *Gardner v. Sch. Bd. Caddo Parish,* 958 F.2d 108, 112 (5th Cir. 1992). Plaintiffs bear the burden of demonstrating the futility or inadequacy of administrative review. *Id.* (citing *Honig v. Doe,* 484 U.S. 305, 108 S.Ct. 592, 606, 98 L.Ed.2d 686 (1988)). The IDEA's exhaustion requirement serves a number of policy objectives: it allows deference to agency expertise in resolving educational matters; it gives the agency a first opportunity to correct errors; it presents courts with a more fully developed record; and it prevents parties from deliberately disregarding the statute's comprehensive procedures and remedies. *Charlie F. v. Bd. of Educ.,* 98 F.3d 989, 992–93 (7th Cir.1996). Due to the IDEA's administrative exhaustion requirement, the Court does not have subject matter jurisdiction to consider Plaintiffs' IDEA claims based on events occurring after August 13, 2004. Plaintiffs have failed to establish that exhaustion is futile or inadequate.

The IDEA bars Plaintiffs from circumventing the IDEA's administrative exhaustion requirement by taking claims that could have been brought under the IDEA and repackaging them as claims under some other statute. *Eddins v. Excelsior Indep. Sch. Dist.,* 1997 WL 470353, *9, 1997 U.S. Dist. LEXIS 12091, *28 (E.D.Tex. Aug. 6, 1997); *B.H.Y. v. La Pryor Indep. Sch. Dist.,* 2004 WL 2735193, *2, 2004 U.S. Dist. LEXIS 24561, *5 (W.D.Tex. Nov. 29, 2004); *see Jeremy H. v. Mount Lebanon Sch. Dist.,* 95 F.3d 272, 281 (3rd Cir.1996). Due to the IDEA's administrative exhaustion requirement, the Court does not have subject matter jurisdiction to consider Plaintiffs' Section 1983, Section 504, and ADA claims based on alleged violations of the IDEA occurring after August 13, 2004. A litigant may not

escape this requirement of administrative exhaustion by pleading a related cause of action under a different federal statute, e.g., 42 U.S.C. § 1983. *Eddins at* 1997 WL 470353, at *9, 1997 U.S. Dist. LEXIS 12091, *28; *W.B. v. Matula,* 67 F.3d 484, 495 (3d Cir.1995) (stating "the exhaustion requirement [of IDEA] may not be circumvented by casting an IDEA claim as a Section 1983 action predicated on IDEA.")

**D. Plaintiffs have failed to establish that the Defendants failed to provide Marc with a FAPE between August 13, 2003 and August 13, 2004.**

An aggrieved party has the right to appeal an IDEA hearing officer's decision to a district court of the United States. 20 U.S.C. § 1415(i)(2)(A). When a court reviews a hearing officer's decision under the IDEA, the Act requires the court to receive the records of the administrative proceedings and hear additional evidence at the request of the party. 20 U.S.C. § 1415(i)(2)(C); *see Cypress–Fairbanks Indep. Sch. Dist. v. Michael F.,* 118 F.3d 245, 247 (5th Cir.1997), cert. denied, 522 U.S. 1047, 118 S.Ct. 690, 139 L.Ed.2d 636 (1998). The Court "must accord due weight" to the hearing officer's findings, but it must ultimately reach an independent decision based on a preponderance of the evidence. *Houston Indep. Sch. Dist. v. Bobby R.,* 200 F.3d 341, 347 (5th Cir. 2000), *cert. denied,* 531 U.S. 817, 121 S.Ct. 55, 148 L.Ed.2d 23 (2000). Thus, the district court's review is "virtually *de novo.*" *Id.* (quoting *Michael F.,* 118 F.3d at 248, 252).

■ While review of the hearing officer's decision is virtually *de novo,* the IDEA creates a presumption that the IEP and resulting placement adopted by the IEP team are appropriate. *See Michael F.,* 118 F.3d at 252; 34 C.F.R. § 300.343. Accordingly, the party challenging the

IEP must prove by a preponderance of the evidence that the IEP is inappropriate.

The Court's task is "not to second-guess state and local policy decisions; rather, it is the narrow one of determining whether state and local school officials have complied with the Act." *Flour Bluff Indep. Sch. Dist. v. Katherine M.*, 91 F.3d 689, 693 (5th Cir.1996). This is a two-pronged inquiry: (1) whether the District had complied with the procedures set forth in the IDEA, and (2) whether the resulting IEP is reasonably calculated to provide a meaningful educational benefit. *Michael F.*, 118 F.3d at 249; *Bd of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 3048, 73 L.Ed.2d 690 (1982). The Fifth Circuit has identified four factors for analyzing whether the IEP was reasonably calculated to provide a meaningful educational benefit under the IDEA:

(1) the program is individualized on the basis of the student's assessment and performance;

(2) the program is administered in the least restrictive environment;

(3) the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and

(4) positive academic and non-academic benefits are demonstrated.

*Michael F.*, 118 F.3d at 249. Reimbursement for expenses incurred by parents as a result of a unilateral placement of their child in a private school setting may be ordered only if the parents establish that (1) an IEP calling for placement in a public school was inappropriate under the IDEA, and (2) the private school placement by the parents was proper under the Act. *Id.* at 248.

It is important to note, however, that "[t]he free appropriate public education proffered in an IEP need not be the best possible one, nor one that will maximize the child's educational potential; rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction." *Adam J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir.2003). The IDEA only guarantees disabled students "a basic floor of opportunity, consisting of specialized instruction and related services which are individually designed to provide educational benefit." *Id.* The party challenging the propriety of an IEP bears the burden of establishing why the IEP and the resulting placement are inappropriate under the IDEA, which requires:

[M]ore than a de minimis failure to implement all elements of that IEP, and instead, must demonstrate that the school board or other authorities failed to implement substantial or significant portions of the IEP. This approach affords local agencies some flexibility in implementing IEP's, but still holds those agencies accountable for material failures and for providing the disabled child a meaningful educational benefit.

*Bobby R.*, 200 F.3d at 349. Procedural defects alone do not constitute a violation of the right to FAPE unless they result in the loss of an educational opportunity or infringe on the parent's right to participate in the IEP process. *Adam J.*, 328 F.3d at 811–12. A procedural violation of the IDEA results in a denial of FAPE only if it causes substantive harm to the child. *Id.* at 812.

The Court finds that Defendants complied with the procedures set forth in the IDEA and that the IEPs developed at ARD committee meetings between August 13, 2003 and August 13, 2004 were reasonably calculated to provide a meaningful educational benefit to Marc. After reviewing the administrative record, the Court

concludes that Plaintiffs' unilateral actions in removing Marc from school during the 2003–04 school year and demanding homebound placement without obtaining prior ARD committee approval prevented Marc from realizing all the benefits of his IEPs.

The Court disagrees with Plaintiffs assertion that the ARD committee was *required* to consent to the homebound placement prescribed by Dr. Harkins. The IEP is developed by the ARD committee for each student with a disability. 19 Tex. Admin. Code § 89.1055(a). Contrary to Plaintiffs assertions, 19 Tex. Admin. Code § 89.63 does not mandate ARD committee deferral to a doctor's homebound placement decision when this section is considered in the context of other IDEA statutory provisions. Section 89.63 states that "[i]nstructional arrangements / settings shall be based on the individual needs and individualized education programs of eligible students and shall include the following: ... homebound [placement] ... as documented by a physician." The section further states that "[t]he student's ARD committee shall determine the amount of services to be provided to the student in this instructional arrangement/setting [homebound placement] in accordance with federal and state laws, rules, and regulations." The Court agrees with Defendants' argument that the IDEA provides no authority to allow an ARD committee to delegate its duty to ensure an IEP in the least restrictive environment ("LRE"). 20 U.S.C. § 1412(5)(B). Under the LRE provision, the District has a duty to mainstream special education students to the maximum extent appropriate. 20 U.S.C. § 1412(a)(5)(A). The statutory language of the Texas Administrative Code does not trump the statutory language of the IDEA, which requires the ARD committee to ensure an IEP in the least restrictive environment. Marc's parents were entitled to get an ARD committee decision on

his homebound placement, and then appeal that decision in a due process hearing if they were unhappy with the results. Instead, the parents chose to unilaterally withdraw Marc from school and refuse to consent to the ARD committee's requests to speak with Dr. Hawkins so that it could make a decision on whether Marc's homebound placement was the LRE. The Court believes that when Marc's parents refused to allow the District's professional staff to speak with the physician, the committee did not have enough credible evidence to support such a restrictive placement. The District had a right to test Marc itself in order to evaluate or reevaluate his eligibility for services under the IDEA. *See Andress v. Cleveland Indep. Sch. Dist.*, 64 F.3d 176, 178 (5th Cir.1995).

Summary judgment remains appropriate in an IDEA case when there is no genuine issue of material fact. *Bobby R.*, 200 F.3d at 350 (affirming summary judgment for school district). "The mere existence of some factual dispute will not defeat a motion for summary judgment; Rule 56 requires that the fact dispute be genuine and material." *Willis v. Roche Biomedical Laboratories, Inc.*, 61 F.3d 313, 315 (5th Cir.1995).

Summary judgment is appropriate in this case because there is no genuine issue of material fact as to whether Defendants have satisfied the *Michael F.* two-pronged inquiry. The Court finds that the District complied with the procedures of the IDEA, which is the first prong of the two-pronged inquiry. On August 14, 2003, the ARD committee developed and implemented an elaborate IEP for the 2003–04 school year. Tr. 361–62. The ARD committee met nine times to review Marc's IEP for services during the 2003–04 school year. Tr. 991–1158. Although Marc had not been regularly attending Oak Grove Elementary after his parents unilaterally decided to re-

move him from school, an ARD committee meeting was convened on November 19, 2003 to review and develop new IEP goals for Marc's speech therapy. Tr. 628. Although Plaintiffs claim that the District failed to provide notice to Marc's parents explaining the decision to deny homebound placement, the Court believes that the ARD committee was unable to make a decision on the homebound placement until Marc's parents gave consent to allow the committee to interview Dr. Harkins, who prescribed the homebound placement and diagnosed the PTSD. The administrative record supports this position. Tr. 1117. Plaintiffs have not established that any procedural violation of the IDEA caused substantive harm to Marc between August 13, 2003 and August 13, 2004. Indeed, the record reflects that the District was willing and able to implement Marc's IEP immediately upon his re-enrollment in school by his parents. Tr. 1111–1131, 1091–1097, 1120.

The Court also finds that Marc's IEP was reasonably calculated to provide a meaningful educational benefit to him under the IDEA, which is the second prong of the two-pronged inquiry. First, Marc's IEP was individualized on the basis of his assessment and performance. The administrative record establishes that the ARD committee developed a very specialized program for Marc, which included IEP goals and objectives in cognitive skills, fine motor, language, self-care, and socialization. Tr. 1007–1010. Marc also received related services in speech therapy, occupational therapy, and transportation to and from school. Tr. 993. On April 4 and April 11, 2003, the ARD committee considered the specific areas in the Autism Supplement and agreed to provide extended school services, minimal unstructured time, in-home training, privatized behavioral objectives (communication, self-help, and socialization), parent training, and a low staff-to-student ratio. Tr. 1003 –1004.

The ARD committee also added music therapy, in-home training and parent training, and increased speech therapy services during the 2003–04 school year from 2 to 2½ hours per week. Tr. 1030–1044 (music therapy), 1045–1062 (in-home training and speech therapy). Any argument that Marc's IEP was not individualized on the basis of Marc's assessment and performance is not supported by the record.

Second, Marc's IEP was administered in the least restrictive environment. In the Fall of 2003, the ARD committee agreed to a less restrictive placement of Marc by increasing time in the regular education pre-K classroom at Oak Grove Elementary. Tr. 995. Marc's program and placement were developed based on the assessments that recommended more class structure than is possible with only general education support; specialized methods, materials or modified instructional content; and smaller class size with more individual support. Tr. 899, 944–947. These assessments had to be balanced against the need for reinforcing socialization skills in light of Marc's autism. The ARD committee addressed these concerns through IEPs in language, communication, and socialization, speech therapy as a related service, and by allowing interaction for half the school day with non-disabled peers in the regular education classroom. Tr. 995. Many of Marc's IEP goals would be practically impossible to implement in a homebound setting. Tr. 1059–60. Plaintiffs failed to establish that Marc's placement was inappropriate. Any argument that Marc's IEP was not was not administered in the least restrictive environment is not supported by the record.

Third, the services were provided in a coordinated and collaborative manner by the key stakeholders. To establish a denial of FAPE under this third prong, Plaintiffs must demonstrate that NEISD failed

to implement "substantial or significant provisions of the IEP." *Bobby R.,* 200 F.3d at 349. The record establishes that the District's staff was qualified and properly implemented Marc's IEP. Marc's teacher and aide were adequately certified and trained to meet Marc's educational needs. Tr. 1278–1402. Plaintiffs praised Marc's teachers, aide, and related services personnel. Tr. 1180–1184. The District maintained extensive documentation regarding Marc's progress on IEP objectives and daily detailed notes regarding implementation of the IEPs. Tr. 635, 636, 649, 654, 1238–1255, 1260. Marc's teachers and therapists provided testimony that Marc made educational progress when he came to school. Tr. 327, 333–34, 338, 349, 357, 359–60, 367, 376, 381–82, 386. Any argument that services were not provided in a coordinated and collaborative manner by the key stakeholders is not supported by the record.

Finally, positive academic and non-academic benefits were demonstrated. Although Marc attended school sporadically during the school year, the record supports the position that positive academic and non-academic benefits were demonstrated under Marc's IEP when he attended school. Marc's IEP updates, the testimony of his teachers, and the letters written by his parents demonstrate academic progress during the 2003–04 school year. Tr. 635–636, 649–654, 333–335, 338–339, 348–49, 357, 360, 367, 376, 381–382, 386. Additionally, in November 2003, the ARD committee convened and adjusted Marc's speech IEP objectives because he had mastered the majority of them. Tr. 628. Marc also demonstrated progress in non-academic skills including appropriate interaction with peers and adults, making friends, emulating his non-disabled peers, self-feeding skills, and improved toilet skills. Tr. 1182–84, 327 (toileting), 334–35 (social interaction), 382 (turn-taking in a group). Any argument that positive academic and non-academic benefits were not demonstrated is not supported by the record.

In conclusion, the Court finds that the District provided Marc with a FAPE between August 13, 2003 and August 13, 2004. The Court acknowledges that allegations of mistreatment appear to have motivated Marc's parents in their decision to unilaterally withdraw him from school and their insistence on homebound placement. However, the decision to remove Marc from school or significantly alter his IEP should have been made in consultation with the ARD committee. The record establishes that the aide who allegedly mistreated Marc was properly certified, and the witnesses who testified firsthand to the alleged mistreatment did not have a background in special education. More importantly, these allegations of mistreatment, even if true, do not significantly impact the Court's two-pronged inquiry under the *Michael F.* standard: (1) whether the District has complied with the procedures set forth in the IDEA and (2) whether the resulting IEP is reasonably calculated to provide a meaningful educational benefit. After these reports of mistreatment were relayed to Marc's parents, they obtained the PTSD diagnosis and the prescription for homebound placement, and they largely refused to cooperate with the ARD committee. Marc's parents should have cooperated with the ARD committee in addressing the homebound placement issue, the PTSD diagnosis, and the related mistreatment allegations.

**E. Plaintiffs ADA, Section 1983, and Section 504 claims based on alleged violations of the IDEA occurring between August 13, 2003 and August 13, 2004 fail as a matter of law because Plaintiffs' IDEA claim has failed.**

Since Defendants complied with the IDEA during the relevant time period, Plaintiffs cannot prevail on their derivative

Section 1983, Section 504, and ADA claims as a matter of law. *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 297 (5th Cir.2005) (en banc) (holding that Plaintiffs' redundant non-IDEA claims were barred by issue and claim preclusion where there were administrative findings that the school district complied with the IDEA). Additionally, the individual Defendants are not subject to liability under either Section 504 or the ADA. *Lollar v. Baker*, 196 F.3d 603, 609 (5th Cir.1999).

### III. CONCLUSION

Defendants' motion for summary judgment is GRANTED (docket no. 18, docket no. 39). Plaintiffs' motion for partial summary judgment is DENIED (docket no. 30). Defendants' motion to limit additional evidence is GRANTED (docket no. 48). Defendants' motion to strike Plaintiffs' expert reports and testimony is GRANTED (docket no. 50).